[Civ. No. 16087. First Dist., Div. One. Feb. 3, 1955.]

Estate of JENNIE CESARE, Deceased. FRANK FERLITO, as Special Administrator, etc., Appellant, v. PAUL CESARE, Respondent.

O'Keefe & O'Keefe for Appellant.

Frank V. Kington for Respondent.

PETERS, P. J.—Jennie Cesare died testate on June 30, 1952. Left surviving her were Paul Cesare, who claimed to be Jennie's husband, and three sons, who were the issue of Jennie and Salvatore Ferlito from whom Jennie had been divorced, the interlocutory decree having been obtained on February 13, 1930, and the final having been entered on April 1, 1931. Frank Ferlito, one of the sons, was appointed special administrator of the estate. Paul Cesare then filed a petition in the probate proceeding asking for the assignment to him of certain personal property exempt from execution, for a probate homestead, and for a family allowance. He alleged that he and the deceased were husband and wife,

and had been for 20 years preceding her death; that they had no issue; that the property, both real and personal, standing in the name of Jennie, was in fact community property; that he was 54 years of age, in such physical condition as to be unemployable, and that $125 a month was a reasonable amount for the claimed family allowance. The special administrator opposed the petition. He claimed that the properties listed in the inventory and standing in the name of Jennie were her separate property, and that Jennie and Paul were, in fact, not legally married. After a lengthy trial the lower court found that all of the property listed in the inventory, and certain other designated property, was intended by the parties to be and was the community property of Paul and Jennie, and that any separate property owned by Jennie had become indistinguishably commingled with the community property. It also found that the items of property listed by Paul and certain other items were property assignable to Paul as property exempt from execution; that petitioner needed $75 a month as and for his support, and that a certain house on Vera Avenue, Redwood City, which was the only real property in the estate, was acquired as community property. This property was set aside to Paul as a probate homestead in fee simple absolute. Frank Ferlito has appealed from these orders.

At the trial and on this appeal the two main questions presented were whether Paul and Jennie were husband and wife, and, if so, what was the nature of the property involved, community or separate?

The marriage issue simply presented a question of fact. Admittedly, Jennie secured her interlocutory decree from Ferlito on February 13, 1930. Admittedly, Paul and Jennie went through a marriage ceremony on December 20, 1930. That marriage was, of course, invalid, because Jennie was then still married to Ferlito, the final decree not being entered until April 1, 1931. But Paul and his witnesses offered evidence to the effect that early in April of 1931, after the divorce from Ferlito had become final, Paul and Jennie were married a second time by a clergyman under the provisions of section 79 of the Civil Code. Admittedly, they lived together as husband and wife from 1930 until Jennie's death in June of 1952.

This evidence as to the second marriage came into the case under the following circumstances. Paul, during the presentation of his case in chief, merely proved the divorce

from Ferlito and his, Paul's, marriage to Jennie. At the conclusion of Paul's case appellant moved to dismiss the proceedings on the ground that the evidence demonstrated that Paul and Jennie were not lawfully married. Counsel for Paul expressed surprise that the marriage issue had been raised, and moved to reopen the case in order to prove the second marriage. The court granted the motion, and the evidence was then introduced.

Appellant contends that the granting of this motion constituted an abuse of discretion. The point is without merit. It is too well settled to require extended discussion that the trial court may reopen a case any time before decision to permit the introduction of further evidence (see cases collected 24 Cal.Jur. p. 768, § 49 et seq.) " '. . . so long as the power is exercised with due regard to the adverse party's right to fully present his side of the case there can be no prejudice of which he has the right to complain on appeal.' " (*Braden* v. *Lewis,* 119 Cal.App.2d 84, 89 [259 P.2d 16], quoting from *Badover* v. *Guaranty Trust etc. Bank,* 186 Cal. 775, 778 [200 P. 638].) In the instant case appellant was given full opportunity to present, and he did present, all the testimony he desired on the issue. There was no abuse of discretion in reopening the case.

The main attack made by appellant on the issue of the validity of the second marriage is that the evidence produced by respondent on this issue was vague, uncertain and so inherently improbable that it should not have been believed by the trial court. But it was so believed, and the trial court found that such second marriage had taken place. We believe that the evidence supports the finding.

The evidence shows that Jennie was of Sicilian origin and unable to read or write English. The sister of Paul, Ida Johnson, testified that she had acted as the interpreter and witness for Jennie when Jennie secured her interlocutory from Ferlito in February of 1930. When Paul and Jennie were married in December of 1930, Ida became worried about the validity of the marriage, and, at the request of her brother, consulted a lawyer. She was unable to remember the name of the attorney, but remembered that he had offices in the Phelan Building. The attorney arranged for the validating ceremony under section 79 of the Civil Code. Ida testified, as did Paul, that they and Jennie went to a Protestant church in the Mission district in San Francisco, and were married by a clergyman whose name had been forgotten. Both Ida

and Paul testified as to the performance of the ceremony and the issuance of a certificate of the marriage, which was delivered to Jennie. No written record of this second marriage was produced, nor could either Paul or Jennie remember the names of the lawyer, the minister or the church, nor could they fix the precise location of the church. The whole affair was kept as secret as possible to avoid scandal and embarrassment to the family, although several members of Paul's family testified that the fact that the second marriage had taken place was generally known to them. It should also be mentioned that Jennie, in two wills executed in 1940 and 1945 respectively, referred unequivocally to Paul as her husband.

In an effort to refute this testimony appellant produced his wife Louise Ferlito, who testified that she knew Jennie very well, and that, on several occasions, estimated at more than six, Jennie had told the witness that her marriage to Paul was invalid. But this witness was present when Jennie executed the 1945 will and knew that it contained a clause referring to Paul as the testatrix' husband, and made no attempt to call this discrepancy to the attention of Jennie. The credibility of this witness was for the trial court.

In addition to submitting both Ida and Paul to a grueling cross-examination, in which the vagueness, uncertainty, and omissions in their testimony were highlighted, appellant produced two private investigators who were hired by appellant to check all the churches in the Mission district where the two witnesses had testified the ceremony took place. Their search disclosed no church in the area with a record of the marriage.

Section 79 of the Civil Code provides: "When unmarried persons, not minors, have been living together as man and wife, they may, without a license, be married by any clergyman. A certificate of such marriage must, by the clergyman, be made and delivered to the parties, and recorded upon the records of the church of which the clergyman is a representative. No other record need be made."

Inasmuch as this section requires the church to keep a record of the marriage, and no such record could be found, appellant argues that he has established to a certainty that no such marriage took place. But the evidence is not so conclusive. The investigators based their investigations on the churches listed in a designated city directory for the year 1930-1931. They made their investigation in March of 1953.

They could investigate, of course, only the churches in existence in 1953. Respondent called to the attention of the trial court the fact that other city directories showed that there were many Protestant churches in the area in 1930 that were no longer in existence in 1953. The trial court elected to believe the testimony of Paul and Ida. The fact that these two witnesses had forgotten names, and were vague and uncertain as to details, does not, as a matter of law, refute their testimony. This second marriage had taken place 22 years before the trial. Human memory is fallible. It is not surprising that the witnesses were not able to remember all of the facts surrounding the ceremony. The evidence that such a ceremony took place was neither unnatural nor improbable. It was for the trial court, who saw these witnesses, to pass upon their credibility. This it has done. This court cannot interfere with the finding.

As already pointed out, the trial court found that all of the property standing in the name of Jennie at the time of her death was in fact the community property of the parties, and not the separate property of Jennie. In this connection the court also found that during their marriage Paul and Jennie had so commingled their separate properties with the community property that it was impossible to trace any of the separate properties of the parties; that although during their marriage the parties held title to various parcels of real property, moneys, bank accounts and evidence of debts in their joint names and in their respective separate names and sometimes in joint tenancy "it was at all said times their intent and the intent of each of them that such real and personal properties, [designating them] . . . were at all times community property of" Jennie and Paul.

These findings applied to the following properties standing in Jennie's name at the time of her death, and listed by appellant in the inventory filed by him:

1. $164.76 cash.

2. Household furnishings (itemized).

3. Promissory note of Ohlemutz, payable to Jennie Cesare, secured by deed of trust, with a balance owing of $5,462.19.

4. Promissory note of Wuebel, payable to Jennie Cesare, secured by deed of trust, with a balance owing of $739.77.

5. Promissory note of Osterhoudt, payable to Jennie Cesare, secured by deed of trust, with a balance owing of $5,561.42.

6. A house on Vera Street, Redwood City, California, in the name of Jennie Cesare, of appraised value of $10,500.

The court also applied these findings to a set of silverware in the possession of Tony Ferlito, and to a promissory note for $2,500 executed by Frank Ferlito, the appellant, and naming Paul and Jennie as payees.

There can be no doubt that the findings of the trial court are amply supported. Before pointing out the evidence that supports these findings, some reference should be made to the specific evidence in reference to the $2,500 Frank Ferlito note. According to the testimony, Frank borrowed $2,500 from Jennie and Paul and gave the note, naming both as payees, as evidence of the indebtedness. Appellant testified that Jennie had told him that he did not have to pay the note unless he was able to, and, in the presence of Paul, had returned the note to him, told him to destroy it, which he did, and that if she died he did not have to repay the money at all. Paul denied this testimony, and also testified that on the day of Jennie's death he saw the note in the metal box in which he and Jennie kept their papers. This box came into the possession of appellant after he was appointed special administrator. The trial court found that appellant secured possession of the note in this fashion, and either still possessed it or had destroyed it, and that it was still owing.

So far as their properties are concerned, Paul and Jennie hopelessly commingled their separate and community properties. They were inveterate real estate speculators, although the only real property remaining in the estate at the time of Jennie's death was the Vera Street property in Redwood City, where they had lived for several years prior to Jennie's death. Some of these properties were taken in their joint names, and some in their individual names. Paul testified, and the court found, that the intent of the couple, regardless of whose name in which the properties were taken, was that the properties belonged to both of them as community property.

It is impossible to separate the separate property of the parties, if any, from their community property. Both had separate property when they married in 1930. Just prior to this marriage Jennie had collected $7,500 in a personal injury action. Paul, at that time, owned a small grocery store and lodging house. The couple lived in the lodging house, with Jennie's three boys, for many years. During those years Paul worked in the grocery store, in the shipyards, drove trucks for various companies, and operated a

taxicab business. In 1950 he gave up the taxicab business in order to take care of his bedridden wife. His health is such that he is no longer employable.

It is a hopeless task to try and trace the source of funds of many of the purchases. A summary of some of the evidence most favorable to respondent follows: Jennie invested some of her original $7,500, which was admittedly her separate property, in purchasing two parcels of realty, one on James Street in Redwood City, and the other on Douglass Street in San Francisco. She also purchased from her separate funds a parcel at 21st and Alabama Streets in San Francisco, paying $2,500 down and assuming a $6,500 mortgage. This mortgage, according to respondent, was paid off with community funds. Then the couple acquired a second parcel on 21st Street, taking title as joint tenants. In 1939 they sold the Alabama Street parcel and the grocery store and lodging house owned by Paul before marriage, to one Mattula, taking back a deed of trust as community property to secure the unpaid purchase price. In 1942 they sold the other 21st Street parcel, receiving back jointly a deed of trust and a down payment. This down payment and subsequent payments on the deed of trust were placed in a joint bank account.

In the meantime, in 1937 and 1938 they purchased parcels in Redwood City on Bayshore Boulevard, and on Redwood Avenue. Title to each was taken in joint tenancy. Subsequently, property in Dumbarton Acres was acquired with title in Jennie's name alone. Paul testified that it was joint tenancy money that paid for it, and explained that title was taken in Jennie's name, because it was planned to let her son Joseph run the place as a chicken farm when he was released from San Quentin.

Next Jennie and Paul took title in joint tenancy to another parcel in Redwood City, and paid for it with their joint funds. This parcel was later sold. In August of 1940, they traded their Redwood Avenue parcel for some real estate at 25th and Castro Streets in San Francisco. Then, in March of 1941, that parcel was in turn traded for certain Valencia Street property. Jennie gift-deeded her interest in this property to Paul, but he testified that they did not intend it to be his separate property. At this same time Paul made over two deeds of trust they jointly held to Jennie alone. When Paul sold the Valencia Street property, he took a mortgage made out to both himself and Jennie, and they

received the payments together. Paul and Jennie next purchased, as joint tenants, additional Redwood City property from one Green and his wife. In May of 1943, property on Birch Street, Redwood City, was purchased. Title was placed in Jennie's name alone, apparently without Paul's consent or knowledge. The respondent testified that he gave Jennie a check for $5,200 to make that purchase. There was evidence that Jennie had deposited that sum in her separate account and then paid $4,573.20 out of that account. Paul testified that funds in that account had come from himself and from a joint tenancy account they had in the same bank. The mortgage covering the balance of the purchase price on the Birch Street property, a sum of $3,000, was paid from the proceeds of further deals executed by the Cesares. Jennie subsequently deeded this property to Paul and took back from him a $10,000 mortgage. Paul stated that this was part of Jennie's plan to boost the valuation of the property and thus be able to sell it at a higher price to some stranger. The Birch Street property was in fact sold to one Wuebel who assumed Paul's mortgage. Part of that debt in the amount of $739.77 was still owing at the time of Jennie's death.

Using community funds, Jennie took title in her own name, and without Paul's knowledge, to certain property in San Carlos. She then conveyed it to Paul when he protested her action. He sold the property and received a check made to both of them for $7,072.19. Then Jennie took title in her own name to property on Finger Avenue in San Francisco, but when it was sold, both Paul and Jennie signed the conveyance, and both received the purchase check for $7,400.

Property on Cleveland Street in Redwood City was the next acquisition. The purchase was made with Paul's check for $4,000 plus another $500 for furniture. This same furniture was later moved to the Vera Street home where they lived at the time of Jennie's death, and it is, apparently, the furniture inventoried by the special administrator and found to be community property. Paul, at the time of acquisition, signed the deed over to Jennie, but he insisted that it was never their intention to make the property his wife's separate property. In addition, his sister stated that Jennie said at the time that it did not make any difference whether his name or hers was on the deed.

Property on Fay Street in Redwood City was purchased on October 14, 1948, and again Paul was directed by Jennie

to sign over title to her, in the belief that the property belonged to both of them. They used the deed of trust on the Cleveland Street property as payment. Then Jennie deeded the Fay Street property to one Ohlemutz, whose note is part of the estate's assets.

On December 3, 1948, using as consideration the deed of trust given by Wuebel when he purchased the Birch Street property and assumed Paul's $10,000 mortgage, Jennie took title alone to certain Dumbarton Oaks property. Paul stated that he allowed her to do this after she had nagged him day and night. Ultimately, the property was sold to one Osterhoudt whose promissory note to Jennie was inventoried in her estate.

When they next bought real property, on Vera Avenue, Redwood City, it was a house and adjacent lot. They took title to this parcel in Paul's name alone. Paul stated that Jennie said that she wanted to show him that she did not mean anything wrong in putting property in her own name earlier. They sold the house to Tony Ferlito, Jennie's son, and sold the lot to another party who later resold the lot to the Cesares again with title, this time, in Jennie's name alone. To finance the repurchase, they jointly borrowed $1,400, and when they decided to build a home of their own on the lot, they contracted jointly for construction of the dwelling. Title was in Jennie alone, but as the building contractor testified, she stated the home was for both of them.

There is much more testimony in the record. Bank accounts were opened and closed, funds were indiscriminately transferred from bank to bank, and many properties purchased and sold. It is unnecessary to try and summarize this confused evidence. Enough has been stated to show how the separate and community funds of the parties were commingled. It is impossible to segregate them. As already pointed out, Paul testified that it was the intent of the parties, however title was held, that all their holdings were to belong to both as community property. Certainly, community property was used in large part in the acquisition of each of the items here under consideration.

Appellant's main attack on the findings that items here were community property is predicated on the testimony of Louise Ferlito, wife of appellant, to the effect that in 1939 or 1940 Jennie told her that she was unhappy with Paul and "that she was going to make a property settlement with him." This witness also testified that in 1943 Jennie told

her that she, Jennie, had made such a settlement with Paul, by giving him the Valencia Street property and some cash. Appellant argues that the pattern of the conduct of the parties after 1943 indicates the separate character of their holdings. This testimony, while it might have supported a finding of the separate character of the property, was obviously not believed by the trial court, and did no more than create a conflict in the evidence.

Of course, the fact that the properties here involved were in the name of Jennie, and were conveyed to her after marriage in that manner, raised a presumption that they were Jennie's separate properties. (Civ. Code, § 164; see cases collected 10 Cal.Jur.2d p. 713, § 43.) ██ The presumption, as against the surviving husband, is rebuttable. (See cases collected 10 Cal.Jur.2d p. 716, § 44.) ██ Paul testified that, in spite of the form of the conveyances, the parties intended and he believed, the property was to remain community property. This was sufficient to rebut the presumption. (See cases collected 10 Cal.Jur.2d p. 730, § 54.) This alone would support the questioned finding. ██ But, in addition, Paul offered evidence that all of the properties here involved had been acquired after marriage, and that whatever separate properties the parties had before marriage had been commingled with community property. This raised a presumption that all of the commingled property was community. (*Falk* v. *Falk*, 48 Cal.App.2d 762 [120 P.2d 714]; see other cases collected 10 Cal.Jur.2d p. 702, § 35.) Thus, the challenged finding is amply supported, and for that reason cannot be disturbed by this court. (See cases collected 10 Cal.Jur.2d p. 702, § 35.)

Appellant contends that it was error to permit Paul to negative his several grants to his wife. Appellant's theory seems to be that this amounted to varying the terms of a written instrument by parol. The point is without merit. ██ Paul merely undertook to prove, as is common in divorce or probate proceedings involving a deceased spouse, that he and his wife had certain oral agreements as to the ownership and title of the properties conveyed to the wife. Evidence of such agreements is admissible, and, if believed, will support a finding adverse to the form of the deed. (*Estate of Wilson*, 64 Cal.App.2d 123 [148 P.2d 390]; *Tomaier* v. *Tomaier*, 23 Cal.2d 754 [146 P.2d 905]; see also cases collected 10 Cal.Jur.2d p. 722, § 48.)

██ Appellant also complains that counsel for respondent

was permitted, over appellant's objections, to ask his client several leading questions while respondent was testifying as to the understandings and intent of the parties contrary to the form of the deeds. There is no doubt that a series of leading questions on this subject were asked. Under section 2046 of the Code of Civil Procedure such questions are prohibited on direct examination "except in the sound discretion of the court, under special circumstances, making it appear that the interests of justice require it." Here the record shows sufficient facts to support the trial court's discretion, which can only be upset by proof of abuse. (*Davis* v. *Stulman*, 72 Cal.App.2d 255 [164 P.2d 787].) The witness was vague, uncertain and confused in his testimony. The trial court commented that the witness was "difficult," and "not very intelligent," and apparently needed help if he was to explain anything. This was a sufficient showing of the "special circumstances" required by the code section. Moreover, this case was tried before the court without a jury, so that the possibility of prejudice is most remote. There was no prejudice to appellant in the ruling. (*Nylund* v. *Madsen*, 94 Cal.App. 441 [271 P. 374].)

Appellant also objects to the order granting respondent an absolute fee simple homestead in the Vera Street property. This contention is predicated upon the argument that the Vera Street property was the separate property of Jennie. If that were so, under section 661 of the Probate Code, the court would have been without power to grant an absolute fee as a probate homestead. ■ But where the residence of the parties was their community property, as here, the homestead is properly assignable in the discretion of the court for an unlimited period including an estate in fee simple. (*Estate of Claussenius*, 96 Cal.App.2d 600 [216 P.2d 485].)

Appellant contends that it was error to allow Paul $75 a month as a family allowance inasmuch as he admitted that he had a separate bank account of nearly $4,000. ■ In a proper case, the court may allow support to the surviving spouse even if he or she has separate property. (*Estate of Secord*, 84 Cal.App.2d 783 [192 P.2d 81].) The matter rests in the sound discretion of the trial court. ■ Paul testified that because of his health he was no longer employable, and his testimony was corroborated by that of a doctor. This was sufficient to justify the award.

■ Appellant attacks the order awarding Paul certain

personal property exempt from execution on the ground that section 660 of the Probate Code does not permit such an order based on a petition filed by the surviving spouse before the administrator's inventory is filed. Here Paul filed his petition on November 25, 1952. The special administrator did not file his inventory until December 30, 1952. Paul's inventory of what he thought should be included in the assignment contained in his petition differed in several respects from the inventory later filed by the appellant. The trial court in its finding and order on this issue consolidated the two lists. This was proper. The code section does not prohibit the filing of a petition for such assignment prior to the filing of the inventory, and no sound reason has been advanced as to why such requirement should be implied.

It is next contended that the court improperly excluded testimony of an impeaching witness. Paul had been permitted to testify that he had not been drunk while employed as a taxicab driver, and that he drank wine only with his meals. Appellant produced a witness through whom he offered to prove that Paul drank on the job and had been frequently criticised for it. This testimony was offered to impeach Paul's credibility. Evidence of Paul's drinking was, of course, immaterial, but in view of the admission of Paul's testimony on the issue the proffered testimony probably was admissible on the issue of Paul's credibility. But its exclusion could not have been prejudicial, particularly since the trial court knew of the nature of the excluded evidence by reason of the offer of proof.

Appellant's last contention relates to the record on appeal. The briefs fail to spell out appellant's precise contention. Apparently appellant desires to augment the record to include a transcript of a proceeding in which Paul and certain other witnesses testified as to what had happened at the trial. As far as we can tell it would appear that appellant, in the trial court, challenged the correctness of the transcript in several respects, and a proceeding was there had to determine the validity of the objections. The transcript as filed in this court bears the certification of the trial judge that the transcript "as corrected . . . is true and correct." The proceeding to which appellant refers was probably that designed to hear requests for corrections under Rule 8(b) of the Rules on Appeal. If, as here, corrections are allowed, the judge then certifies the record as corrected. Appellant's opportunity to correct the transcript was in that

proceeding (*Williams* v. *Davis*, 27 Cal.2d 746 [167 P.2d 189]), and he apparently secured some corrections. This court cannot pass on the correctness of the transcript.

The motion to augment is denied; the orders appealed from are affirmed.

Bray, J., and Wood (Fred B.), J., concurred.