*651
 
 SHOEMAKER, J.
 

 This is an appeal by Nicky Rogoff, decedent’s son by a prior marriage and the executor of his estate, from an order confirming the report of the probate commissioner and setting apart a probate homestead to Hazel Rogoff, the surviving spouse of the decedent, Joseph Rogoff.
 

 The record shows that on January 7, 1936, the decedent, Joseph Rogoff, purchased a house on 22d Street in San Francisco for $1,500. On December 29, 1937, he borrowed $1,100 and gave a deed of trust on the property to secure the loan. Sometime in 1938, Joseph met the petitioner, Hazel Rogoff, who was then living in Los Angeles. He subsequently asked her to marry him, informing her that he had a nice home in San Francisco, that “the home is not big, but it is going to be ours.” On March 10,1939, Joseph and Hazel were married. Prior to leaving Los Angeles, Hazel sold her furniture for $100. She and her husband then moved into the 22d Street house in San Francisco, and Hazel gave him her $100 so that he could make a payment on the house. Shortly thereafter, Hazel obtained a job in a laundry. She was employed continuously thereafter until shortly before the death of her husband in 1959. During the entire course of the marriage, Hazel’s earnings were applied to community expenses. Up until 1942, Hazel would cash her paychecks and give the money to Joseph. From their combined earnings he would then make the payments on the house and pay their other living expenses. By April 22, 1940, the encumbrance on the house was paid off.
 

 Thereafter, in 1942, Joseph suggested that Hazel keep her paychecks and use them to buy groceries and other necessities. From that time on, she paid the bulk of the community expenses from her earnings, and Joseph appears either to have saved his earnings in a separate account or to have spent them on items for himself. When Nicky got out of the service, Joseph made him a gift of $3,500 in bonds. Hazel asked him why he had given so much money to Nicky, and Joseph told her, “Ain’t it enough we got a house? We don’t need that money—we are going to get pension and we got the house and what else we want?” On numerous other occasions, Hazel asked Joseph when he was going to put her name on the deed to the 22d Street house in accordance with their agreement. Joseph always told her not to worry about it, that they had no way of knowing which of them would die first, and that the house would be hers if anything happened.
 

 During the entire course of the marriage, Hazel shared
 
 *652
 
 equally the costs of taxes and improvements to the house, i.e., half of the roof repairs of $50; half of the $800 for sidewalk repairs; and half of the $1,000 cost for siding the house.
 

 In 1951, Joseph, without Hazel’s knowledge, made a will leaving his estate to his son, Nicky, and bequeathing $5.00 to Hazel. The 22d Street property was specifically left to Nicky. In 1953 or 1954, Joseph retired, and his income was limited to his pension as a longshoreman. Hazel continued to work until 1959, when she quit her job to nurse Joseph in the last two months before his death.
 

 Upon this evidence, the court entered the order appealed from.
 

 Appellant’s sole argument for reversal is that the court erred in setting aside certain property as a probate homestead in fee rather than for a limited duration, based upon its finding that the property set aside was the community property of the decedent and his widow, as against appellant’s contention that the property was the decedent’s separate property. He argues that Probate. Code, section 661, specifically .provides that the separate property of a decedent may be set apart as a probate homestead only for a limited period, and in no case beyond the lifetime of the surviving spouse. Appellant concedes that a husband or wife may transmute his or her separate property into community property by way of executed oral agreement, but insists that there was no evidence in the case at bar to support the trial court’s finding that the 22d Street property underwent such a change in character.
 

 The California cases disclose that our courts have found a transmutation of property from separate to community as the result.of an executed oral agreement based upon various factors. In
 
 Title Insurance etc. Co.
 
 v.
 
 Ingersoll
 
 (1908) 153 Cal. 1, 5 [94 P. 94], the court stated that an express agreement need not be proved, and that “The gift or change in the
 
 status
 
 of the property may be shown by the very nature of the transaction or appear from the surrounding circumstances.” In
 
 Marvin
 
 v.
 
 Marvin
 
 (1941) 46 Cal.App.2d 551 [116 P.2d 151], the husband had purchased a parcel of real, property seven months prior to marriage. His prospective wife contributed her own money toward the purchase price on the understanding that the property would become community property when the parties were married. Immediately following the marriage, the husband renewed this promise and thereafter referred to the property as community. The remaining payments came from the husband’s earnings, and taxes and
 
 *653
 
 assessments were also paid from community funds. The court held this evidence sufficient to show an executed oral agreement changing the status of the property from separate to community. In
 
 Lawatch
 
 v.
 
 Lawatch
 
 (1958) 161 Cal.App.2d 780 [327 P.2d 603], the court upheld a finding that the husband’s earnings after a decree of separate maintenance had been transmuted into community property. The court noted that the husband had deposited his earnings in a common account, that the parties had filed joint income-tax returns, and that the husband did not object to his attorney’s statement, made in the presence of the wife, that she owned half the business. Similarly, in
 
 Long
 
 v.
 
 Long
 
 (1948) 88 Cal.App.2d 544 [199 P.2d 47], the husband had acquired two lots prior to marriage. The parties subsequently constructed a house on the property with community funds and continued to live there during the course of the marriage. The court held that there was sufficient evidence that the property had become community since it would be unreasonable to conclude that the lots, which were of relatively small value, should remain the husband’s separate property when the house itself had been built entirely with community funds and the labor of the husband and wife. Again, in
 
 Kenney
 
 v.
 
 Kenney
 
 (1934) 220 Cal. 134 [30 P.2d 398], the court based its finding that separate property had been transmuted into community property upon the wife’s testimony that the parties had orally agreed, both before and after the marriage, that all their property was to be owned “fifty-fifty.” The court noted that the parties’ subsequent conduct showed a consummation of this agreement, since they sold, purchased, mortgaged, and improved their properties in such a manner as to indicate that they considered it to be owned by the community.
 

 We have no doubt that the evidence produced by respondent in this case was sufficient to present a question of fact as to whether the parties had transmuted the 22d Street property from a separate to a community status. In accordance with the reasoning of the
 
 Long
 
 case, it would seem highly unlikely that the parties intended Joseph’s relatively small contribution to remain his separate property. Furthermore, there is ample evidence that the parties operated on a “fifty-fifty” basis similar to that present in the
 
 Kenney
 
 case. This fact would support a finding that the parties had consummated their prior agreement that the property would belong to the community.
 

 
 *654
 
 Where the residence of the parties was their community property, the homestead is properly assignable in the discretion of the court for an unlimited period including an estate in fee simple.
 
 (Estate of Cesare
 
 (1955) 130 Cal.App.2d 557, 569 [279 P.2d 607].)
 

 Order affirmed.
 

 Kaufman, P. J., and Agee, J., concurred.