[Civ. No. 16753. First Dist., Div. One. May 31, 1956.]

JOHN A. CARDOZA, Respondent, v. GEOFFREY H. MILLINGTON et al., Appellants.

Crist, Peters & Donegan and Elton F. Martin for Appellants.

W. Gordon Eustice for Respondent.

AGEE, J. pro tem.*—This is an action brought by John A. Cardoza to reform a "pre-incorporation agreement" between

*Assigned by Chairman of Judicial Council.

himself and his former partner, Geoffrey H. Millington, and to dissolve Stanford Sport Shop, Inc., a California corporation, which took over the partnership business. Hereafter, the plaintiff and respondent will be referred to as Cardoza and the defendants and appellants as Millington and the corporation.

Cardoza and Millington had been friends since 1927, when they lived next door to each other. In 1945, they formed a partnership to engage in the business of selling fishing, hunting and other sporting goods and equipment under the name of Stanford Sport Shop. Their starting capital was small. In the beginning they both slept in the back of the store and ate most of their meals together. They worked long hours. In general, Cardoza managed the fishing end and Millington the hunting end. Ownership, profits and control were equal. The books were loosely kept. In July, 1948, an accountant was hired to set up bookkeeping records. He used January 1st, 1948, as a starting date. The partners agreed that their respective capital accounts would be fixed at an equal amount as of this date. Thereafter, these accounts were never equal because there was always some variance between their respective withdrawals. There was no separate fund maintained for such withdrawals. All funds of the business were commingled and kept in one general account. At the end of an accounting period, one-half of the profits made during such period less the respective withdrawals was credited to each partner's capital account. As of February 29, 1952, Cardoza's capital account was $34,432.90 as against $34,364.39 for Millington. This was the last time it was greater than Millington's. As of December 31, 1952, Millington's capital account was $36,672.42 and Cardoza's was $36,222.17. In May or June, 1953, the partners discussed the advisability of incorporating. Millington consulted with the accountant and with the attorney for the partnership. He reported back to Cardoza that both advised it. Cardoza did not consult with anyone other than his partner. The attorney drafted a "pre-incorporation agreement," which the parties signed on September 3, 1953. Cardoza testified that he signed the agreement without reading it. Clause 2 of the agreement provided: "The parties agree to transfer to the corporation all of the partnership assets, subject to all of the liabilities of the partnership business, and shall receive stock of the corporation in return, in amounts equivalent to the respective *net worth* of the parties." (Emphasis

added.) Cardoza testified that he did not understand the meaning of the phrase "net worth" and no one attempted to explain it to him. As of the accounting period ending August 31, 1953, Millington's capital account stood at $38,969.80 and Cardoza's at $37,091.66, a difference of $1,878.14. The increase in difference since December 31, 1952, resulted solely from the withdrawal during such period of only $6,600.80 by Millington as against $8,028.69 by Cardoza. Cardoza testified that his understanding was that such difference merely gave Millington the right to withdraw this amount from the partnership funds and did not change the equal ownership of the business or create any increased proprietary interest in Millington. It might be noted that the balance sheet of August 31, 1953, shows cash in the amount of $17,978.17 and current liabilities in the amount of $11,404.14. The only additional liability shown was a deferred payment note on which the balance due was $22,121.45. The assets, after depreciation of the building and equipment, totaled $109,587.05. Millington admitted at the trial that he could have withdrawn the $1,878.14 at any time and thus have equalized his capital account with that of Cardoza.

The corporation came into existence with the filing of its articles with the Secretary of State on October 2, 1953. At the organization meeting, held on October 5, 1953, Cardoza, Millington, and one Payne, an employee, were elected directors. Millington had previously explained to Cardoza that "it would be necessary to have one more person on the Board of Directors in order to comply with the laws. In other words, we couldn't have a corporation unless we had one other person. However, we would operate the business the same as we had because the third person would be there as a *matter of form.*" (Emphasis added.) Cardoza further testified on cross-examination: "At that time he [Millington] said that you needed a third person. However, the third person wouldn't make any difference; that third person was a neutral person. After all, we were operating a 50-50 partnership and it would be the same type of operation afterwards. Q. And you believed that? A. I believed—let me put it this way: I believed Mr. Millington. I had no reason to doubt him." The trial court found that the partners were in a confidential relation. Millington does not attack this finding.

Millington prepared or directed the preparation of the minutes of all meetings of the corporation. The minutes of

the first meeting recite that the directors voted to issue shares of stock as follows: 5,912 shares each to Cardoza and Millington as promotional shares; 5,980 shares to Millington and 5,795 shares to Cardoza as consideration for the transfer of their respective interests in the partnership; and 50 shares to the attorney as consideration for his legal services in connection with the incorporation. Millington testified that the difference of 185 shares between his holdings and those of Cardoza was due to the difference of $1,878.14 in their respective capital accounts. Cardoza testified that only the promotional shares were discussed at this meeting.

On December 17, 1953, the corporation obtained a permit to issue stock from the Commissioner of Corporations of the State of California and the shares were issued, as outlined above, on December 28, 1953.

The partnership continued to conduct the business up to and including December 31, 1953. Profits continued to be divided equally and Cardoza continued to have an equal voice in the management of the business. The corporation took over and commenced operating the business on January 1, 1954.

The second corporate meeting was held on January 25, 1954. Millington and Payne voted in favor of Millington's proposal that a general manager be put in charge of the business. Cardoza voted against it. The proposal was continued for further discussion to the next meeting, which was held on February 3, 1954. At this meeting, Millington moved that he be appointed the general manager. Payne seconded the motion and it was carried over Cardoza's objection. This was the first time there had been any dissension between the parties. Thereafter, Cardoza testified, he was treated as an employee and was never consulted about the conduct of the business.

He then went to an attorney, his present counsel, and this action was filed on May 17, 1954.

The complaint is in two counts. The first count is directed against Millington alone and seeks reformation of clause 2 in the agreement of September 3, 1953, on the ground that it did not express the actual agreement of the parties. Cardoza alleges that, prior to the execution of the agreement, the parties had agreed that each should receive an equal number of shares in the corporation and that control of the business would remain in them equally; that clause 2 erroneously provided that shares were to be issued "in amounts equivalent

to the respective *net worth* of the parties''; and that, in not *excepting* the difference between the capital accounts due to difference in withdrawals, the clause in effect *includes* such difference and thus allows to Millington a greater number of shares than those allowed to him which is contrary to their actual agreement. Cardoza alleges that this error was caused by (1) fraud practiced on him by Millington, (2) mutual mistake of himself and Millington, or (3) by his mistake alone, which was known or suspected by Millington.

The trial court found in favor of Cardoza on the theory of mutual mistake. In his proposed findings of fact Cardoza also included findings favorable to him on fraud and unilateral mistake. The trial court drew a line through these and made no finding on either issue, although the evidence, much of which is not referred to herein, would amply support a finding of either fraud, or mistake by Cardoza alone, which Millington at the time knew or suspected. (Civ. Code, § 3399.) Clause 2 was ordered to be reformed to provide as follows: '' 'The parties agree to transfer to the corporation all of the partnership assets, subject to all of the liabilities of the partnership business, and shall receive stock of the corporation in return, *in equal amounts* according to the respective capital accounts of the partners as of September 1, 1953, except that the sum of $1,878.14 accrued to Geoffrey H. Millington as distributable income in excess of John A. Cardoza's withdrawals as of September 1, 1953, shall be credited to Geoffrey H. Millington's drawing account in said corporation.' '' (Emphasis added.) The latter part of the clause, as reformed, commencing with the words '' 'in equal amounts,' '' replaces the words, ''in amounts equivalent to the respective net worth of the parties,'' as contained in the original agreement.

With respect to the clause in question, the trial court found: ''That it is true that prior to the presentation of said agreement, plaintiff and defendant Geoffrey H. Millington had agreed that on incorporation of the Stanford Sport Shop, a copartnership, each should receive an equal number of stock shares in the corporation as represented by the equal capital accounts of the parties as of September 1, 1953, except that the sum of $1,878.14 accrued to defendant Geoffrey H. Millington as distributable income in excess of plaintiff John A. Cardoza's withdrawals as of said date would be credited to defendant Geoffrey H. Millington's drawing account in said corporation and would not be exchanged for stock in said

corporation, the effect of which would be that plaintiff John A. Cardoza and defendant Geoffrey H. Millington would each receive the same number of cash stock shares in the corporation but the corporation would be liable to defendant Geoffrey H. Millington in the sum of $1,878.14 as unwithdrawn accrued distributable income. That it is true that by the mutual mistake of the plaintiff and defendant Millington, said written agreement did not embody the actual agreement theretofore made as aforesaid, but said provision relating to the equal issuance of stock in said Stanford Sport Shop, Inc. according to the respective capital accounts as of September 1, 1953, (excepting defendant Geoffrey H. Millington's $1,878.14 unwithdrawn accrued distributable income) of the parties was not included and the provision that stock be issued equivalent to the net worth (capital account including accrued distributable income of September 1, 1953) of the parties was erroneously incorporated in said agreement.''

Millington attacks this finding on the ground that the evidence is insufficient to support it. He says, (1) Cardoza knew the fact, i.e., the stock was to be issued ''in amounts equivalent to the respective net worth of the parties'' but he may not have known the legal consequences, hence it was, if anything, a mistake of *law* and not of fact; (2) even if there was a mistake of fact, it was not mutual because he, Millington, knew what he intended and the written agreement correctly embodied his understanding; (3) the parties never even considered transferring the $1,878.14 to a drawing account in the corporation, let alone agreeing to it.

Taking up the last point first, it is obvious that the only controversy between Cardoza and Millington is whether their agreement was that the stock should be issued in equal amounts and the control remain equal; that the partners considered control to be important is well illustrated by a clause in a partnership agreement drafted in 1952 by the same attorney who later handled the incorporation. This clause provided: ''The consent of both partners shall be necessary to determine any question as to the conduct of the partnership business.'' Cardoza thought this agreement had been executed but he could not produce a signed copy. However, Millington himself testified that each had an equal voice in the management right up until the corporation took over, irrespective of any difference in their capital accounts. Cardoza has never questioned the right of Millington to the $1,878.14. Millington testified he could have withdrawn

it at any time. Cardoza testified that this amount was supposed to be taken care of on the transfer and the accountant testified that it was "completely feasible" to set it up on the corporation books as a credit in favor of Millington. The equity power in a reformation action is very broad. In *Tomas* v. *Vaughn*, 63 Cal.App.2d 188, at 195, 196 [146 P.2d 499], the appellate court said: "Appellants' contention that the court committed error by inserting terms in the contract as reformed which were never contemplated by the parties nor supported by the pleadings and evidence, is without merit. . . . In the exercise of the broad equitable powers conferred upon the chancellor, the court, in order to avoid any prejudice to the assignee, permitted the 24 payments to be made to the latter and redressed the damage suffered by plaintiff by an award to him of a money judgment against the offending defendant Vaughn alone." The court in the cited case reformed the contract in such a way as to protect the innocent assignee, although some of the terms of the contract as reformed had never been contemplated by the parties. In the instant case, if Cardoza is entitled to reform clause 2 so as to provide for equal amounts of stock, equity would seem to require that the court make some provision for the protection of Millington's right to the $1,878.14. How can Millington claim that he has been prejudiced by the manner in which this was done? We are not unmindful of the rule that courts of equity have no power to make new contracts for the parties (22 Cal.Jur., p. 710) nor of the fact that the parties in this case did not in their discussions "spell out" the method of taking care of the $1,878.14. We do, however, repeat that if Cardoza is entitled to have the same amount of stock as Millington, the incidental transfer of the latter's credit from the partnership books to the corporation's books cannot possibly prejudice Millington, and the reformation ordered in this respect is in keeping with the implied understanding of the parties even though, as we have said, it was not expressly "spelled out" by them.

The real issue is whether the parties agreed that the stock would be issued in equal amounts. Cardoza testified that "the intent was that in transferring to a corporation it would be a 50-50 set-up, as it was as a partnership. That was the intent. . . . Because in our discussion of the matter it was to be transferred on a 50-50 basis, . . . in the same respect it had been as a partnership." On cross-examination of Cardoza, the following occurred: "Q. Let me read that again:

[reading from complaint] 'That each partner should receive an equal number of stock shares in the corporation, as represented by the equal capital account of the parties, excepting each partner's accrued distributable income, which was subject to withdrawal by each respective partner.' A. Yes, that was the intent. Q. That was your intent? A. That was the intent. Q. I'm saying—— A. The understanding. Q. That was your understanding, right? A. Yes, sir. . . . Q. Just explain the intent. Whose intent—when you say 'the intent'? A. *It was the intent and understanding between Mr. Millington and myself.*'' (Emphasis added.) Cardoza also testified as to a conversation which took place between them in 1954, after the trouble started: ''Mr. Millington told me that he had not been aware that there had been a difference of stock at the time of the transfer; had I said something at the time, that he would have done something about it, but it was too late at this time.'' From this it could be inferred that Millington shared the same mistake with Cardoza and thus the mistake was mutual. It is extremely significant that, when Millington followed Cardoza on the witness stand, he did not deny having made this statement to Cardoza.

The second count of the complaint seeks dissolution of the corporation. The first paragraph thereof alleges: ''This second cause of action is made and filed pursuant to the provisions of Sections 4650 and 4651 of the Corporations Code of the State of California.'' Section 4650 provides that a complaint for involuntary dissolution ''may'' be filed by ''a shareholder or shareholders who have been *record holders* for a period of not less than six months and who hold not less than 33⅓ per cent of the number of outstanding shares.'' (Emphasis added.) Paragraph IV of the second count alleges: ''That plaintiff is and has been for a period of not less than six (6) months last past the record owner of not less than thirty-three and one-third percent (33⅓%) of the number of outstanding shares of the corporation.'' This allegation was denied in the answer and thus the issue was expressly before the trial court. There was no waiver of the defense such as that involved in *Salinas Nat. Bank* v. *Cook*, 101 Cal.App.2d 423 [225 P.2d 253], where the plaintiff had failed to file a claim against the decedent's estate as required by section 716 of the Probate Code and the court held that such failure was in the ''nature of a defense in abatement'' which had to be raised in the trial court and, not having been so raised, was deemed to be waived.

Here, the record is without conflict that the corporation did not obtain a permit to issue stock until December 17, 1953, and did not issue any stock until December 28, 1953. This action was filed on May 17, 1954, less than five months after Cardoza became a shareholder of record of outstanding shares. Thus, he had no right on such date to commence an action under section 4650, the very section upon which he expressly alleges his action is being brought.

Cardoza argues that the use of the word "may" in section 4650 indicates that persons other than those enumerated therein are not barred from filing a dissolution action and that the time requirement therein was not intended as a limitation upon the powers of the court.

■ Section 4650 of the Corporations Code was formerly section 404 of the Civil Code, which was enacted in 1931. Prior to this, only the state and not individual stockholders could maintain an action for involuntary dissolution of a corporation. (*Collins* v. *Consolidated Water Co.,* 122 Cal.App. 348, 349 [9 P.2d 872]; *Loney* v. *Consolidated Water Co.,* 122 Cal.App. 350, 352 [9 P.2d 888]; *Elliott* v. *Superior Court,* 168 Cal. 727, 735 [145 P. 101].) When such right was created by section 404 it was in derogation of the common law and the section should be strictly construed. (23 Cal. Jur. 799.)

We conclude that the judgment should be affirmed as to the first count and reversed as to the second count and it is so ordered. It is further ordered that Cardoza and Millington shall each bear their own respective costs on appeal and that the corporation shall recover its costs on appeal from Cardoza and Millington in equal shares.

Peters, P. J., and Wood (Fred B.), J., concurred.