[Civ. No. 6758.   Fourth Dist.   Aug. 1, 1962.]

ROBERT H. SCHULZE, Plaintiff and Respondent, v. DOROTHY I. SCHULZE, Defendant and Appellant.

331

Bigelow & Sullivan and M. Ross Bigelow for Defendant and Appellant.

Beard & Wien and Henry Wien for Plaintiff and Respondent.

GRIFFIN, P. J.—Plaintiff husband brought this action for divorce against defendant wife, alleging extreme cruelty, and sought a division of the community property. Defendant wife, by cross-complaint, sought a divorce on the same ground and sought alimony, attorney's fees, court costs and a *proper* award of the community property.

## Facts

Plaintiff and defendant were married in 1932. In 1960, they were each 50 years of age and had an adult son. From 1946 until 1958, the parties lived in Nebraska. Plaintiff was man-

ager of a large chain department store. Apparently, marital harmony between them began to disintegrate just after defendant wife underwent a hysterectomy operation in 1954. From July 1, 1958, plaintiff claims they were separated and did not live together most of the time. Plaintiff testified to an incident happening in 1954 or 1955 when he and his wife joined with others on a fishing trip in Nebraska and dined at a supper club. Plaintiff stated that he and his friends had drinks before dinner and defendant became very "huffy," very irritable and obnoxious in the presence of his friends. Apparently, she would not drink and "go along with the party." On the next evening, she became "huffy" and would not even eat her dinner that night, which greatly embarrassed plaintiff in front of their mutual friends. Thereafter, and since 1955, plaintiff alleged, his wife displayed great jealousy and great distrust of him and continually nagged him by both words and conduct; that she continually spied on him; that she made frequent trips to the store to see who he was talking with and if she saw him talking to somebody she would embarrass him in front of his employers and in front of the rest of his employees; that she was very critical of his interest in his work and jealous of his job; that she showed great jealousy of other people; that she even many times refused his watching television, or complained about his watching too much television; that she was very critical of his spending time away from home while working; that she made accusations to him of his having too much conversation with the women in the store; that she exhibited a temper when these subjects came up by flying into a rage; that in doing so she would make herself ill and many times a doctor had to be called to quiet her down; that once she became jealous of somebody in the store she would ignore that person when she came into it. Plaintiff testified that at the store's annual Christmas party in 1955, to which husbands and wives of employees were invited, plaintiff's wife accused him of paying too much attention to the other people or the other women in the store; that she flew into a rage, left the party and went home, embarrassing him very much. According to plaintiff, his job required him to socialize at these functions and his conduct there was nothing more than conduct considered normal at Christmas parties. Plaintiff's wife stated that she did not fly into a rage, but only sat at a table and pouted. The party continued well into the morning, but defendant left before it was over. Plaintiff testified that this general conduct of defendant continued over the period they were living together. There was corrobo-

ration of the fishing episode and defendant's actions were related by a friend present at that time. This witness and his wife had known the Schulzes for years and they visited back and forth in their respective homes. The witness told of an occurrence in his home after the trip and said that defendant sat and "looked down her nose" and pouted all evening and did not enter into the spirit of the evening at all, and that he saw plaintiff do nothing that would cause defendant to act that way.

Defendant's claimed ground for divorce was that at the store Christmas party, plaintiff spent most of his time with one of the women who worked at the store and when defendant spoke to him about it he replied, "So what?" and that defendant was embarrassed over the scene. Some reference is made by defendant to an incident that took place in 1955 which caused her to be suspicious of her husband. She testified that plaintiff told her on several occasions that if she ever wanted to go out with someone else it would be all right with him, that he did not care for her any more; that subsequently they lived together as husband and wife, "on again, off again" style; that when she visited his store she found him talking to one woman clerk and that on the next visit she found him talking mainly to another woman there, and she complained of it and told him he was expected to be talking with others in the store because he was the manager. At about this time, defendant alleges, plaintiff started staying away from home more in the evenings, and when he did stay at home he spent most of his time watching television; that after taking a vacation in California, plaintiff decided that he wanted to live there; that one day he told her he wanted her to go along and the next day he said he didn't want her to go; that just prior to July 1, 1958, he planned to leave for California to work there for the same chain stores, and that he informed her that when he arrived there he would be very busy, that she could come along and do whatever she wanted to do, buy a flower shop or something, or sit at home, because his new position would be only temporary, or she could stay there in York, Nebraska, sell their home and live in a hotel, and when he became settled he would send for her. Apparently, she chose the latter course and sold the home. Plaintiff moved to Colorado about July 1, 1958, and they never established a residence together thereafter. In October of that year, after the sale of the home, defendant accepted a job in Nebraska. She worked there in a flower shop until March of 1959, at about $1.00 per hour. They did not keep in touch

with each other, but she did join him in Colorado for a short time to discuss their marital problem, and they had an argument and she left. Finally, plaintiff came to El Centro with the same company, as manager, in April 1959. Defendant wife purchased a flower and novelty shop in Long Beach and went into business with their son, a college graduate who previously had been employed as a bank examiner for the United States Treasury Department.

Between July 1959 and May 1960, plaintiff visited his wife in Long Beach to discuss their marital problem, and they had marital relations. On April 26, 1960, after plaintiff had resided in California for one year, he filed this action for divorce.

Defendant did not appeal from the judgment in its entirety, which also granted her a divorce, but only from that portion granting plaintiff a divorce and from the order awarding alimony and distribution of community property.

Defendant's first claim is that the evidence would not justify granting plaintiff a divorce on the grounds of extreme cruelty and that the occasion of her conduct on the fishing expedition was too remote. The acts complained of by plaintiff, and as disclosed by the evidence, occurred continuously since 1954 or 1955 and until their separation. The incident of the fishing trip was related as one of the examples. There was no evidence that plaintiff condoned this conduct. ▮▮ The question of lapse of time being reasonable or not is generally a factual question for the trial court, and apparently it believed the lapse of time was not unreasonable under the circumstances. (*Hansen* v. *Hansen*, 86 Cal.App. 744 [261 P. 503] ; *Morgan* v. *Morgan*, 190 Cal. 522, 525 [213 P. 993].)

There was sufficient corroboration of these acts on at least two or three different occasions. ▮ In general, where the action is contested, and it is apparent that no collusion exists, the corroboration required is slight and its sufficiency is largely for the determination of the trial judge. (*Ruggles* v. *Ruggles*, 43 Cal.2d 547, 548-549 [275 P.2d 42] ; *Cardew* v. *Cardew*, 192 Cal.App.2d 502, 512 [13 Cal.Rptr. 620].)

Defendant argues that her acts were provoked by the conduct of the plaintiff and therefore cruelty thus provoked does not give rise to a cause of action for divorce. (Citing *Harp* v. *Harp*, 204 Cal. 193 [267 P. 101] ; *Johnson* v. *Johnson*, 14 Cal. 459.) ▮ Provocation does not bar a cause for divorce or defense of recrimination where the conduct of the party claiming to have been provoked was out of all proportion to the provocation. (*Popescu* v. *Popescu*, 46 Cal.App.2d 44 [115 P.2d 208].)

"To justify extreme cruelty by one spouse under the doctrine of provocation, the misconduct of the other spouse must itself be a serious violation of marital obligations." (*De Burgh* v. *De Burgh,* 39 Cal.2d 858, 862 [250 P.2d 598].)

The claimed grounds of extreme cruelty of each of the parties are about of the same character. The court also granted a divorce to the wife on questionable grounds and with little, if any, corroboration. It becomes apparent that the trial court weighed the entire situation and concluded that the conduct of each toward the other sufficiently justified the granting of a divorce to each and that the fault lay not with just one party but with both parties, and that the marriage vows had been so strained that a divorce to each was the most equitable solution. The facts appear to justify this conclusion.     In *De Burgh* v. *De Burgh, supra,* 39 Cal.2d 858, 859, it is held that public policy does not discourage divorce where the relations between husband and wife are such that the legitimate objects of matrimony have been destroyed.

### COMMUNITY PROPERTY

The court divided the community property, of the net value of $26,950.31, equally between the parties. It consisted generally of money, stocks, automobile and the value of life insurance policies. Defendant's argument in this respect is that after 28 years of married life, being over 50 years of age and unable to support herself, she is in desperate need of more than one-half of the community property. *Cardew* v. *Cardew, supra,* 192 Cal.App.2d 502, 517, holds that: "The community property must be divided equally when both parties are awarded a divorce (*De Burgh* v. *De Burgh, supra,* 39 Cal. 2d 858, 874 . . .)."

### ALIMONY

Lastly, as the main complaint, defendant claims that the trial court abused its discretion in awarding her $200 per month alimony and for only a 12-month period.     In determining the question of alimony, the general rule is stated in *McClellan* v. *McClellan,* 159 Cal.App.2d 225, 228 [323 P.2d 811], that concerning the award of alimony to a wife for a period of one year only:

". . . the trial court is given a broad discretion in determining the amount of alimony to be paid and the period during which payment shall continue, which discretion ordinarily will not be interfered with on an appeal save for a manifest abuse thereof. That these matters are within the discretion of the

trial court is made plain by section 139 of the Civil Code which provides that such court may 'make such suitable allowance to the wife for her support, during her life *or for a shorter period as the court may deem just,* having regard to the circumstances of the parties respectively.' (Italics added.)''

Our California courts have consistently voiced approval of this principle. See *Fillmore* v. *Fillmore,* 74 Cal.App.2d 418, 421 [168 P.2d 725]; *Lamborn* v. *Lamborn,* 80 Cal.App. 494 [251 P. 943]; *Newbauer* v. *Newbauer,* 95 Cal.App.2d 36, 40 [212 P.2d 240]. ██ The evidence produced shows that defendant received a substantial sum in the division of the community property. She has been and is in good health and has, in the past, worked for a sum of at least $1.00 per hour in a florist shop. She is engaged jointly with her son in a going business. Her testimony is that her one-half of the net worth of this business was about $6,127.47 and that for the first six months it earned for her about $52 per month net and that it would earn her about $1,400 net for the calendar year 1960. She said her necessary living expenses were about $375 per month. The evidence shows that plaintiff was making about $11,000 per year in 1959 and made $10,000 in 1960. In addition to his general living expenses, plaintiff testified that he is caring for or assisting in the care of his aged mother and father in a rest home, and that, in response to a previous court order, he paid to his wife the sum of $1,250. There are no minor children requiring support. In reference to the claimed net profit of the business which defendant and her son are conducting, plaintiff was not possessed of any records to dispute them, but the court might well have believed that the son would not be thus engaged in such a business, with his educational background and training, at the profits claimed, unless a big increase in that business were anticipated. Cases are cited where time-limited awards of alimony were upheld, such as: *McClellan* v. *McClellan, supra,* 159 Cal.App.2d 225; *Simpson* v. *Simpson,* 134 Cal.App.2d 219, 224 [285 P.2d 313]; *Winn* v. *Winn,* 143 Cal.App.2d 184 [299 P.2d 721].

*Arnold* v. *Arnold,* 76 Cal.App.2d 877 [174 P.2d 674]; *Brawman* v. *Brawman,* 199 Cal.App.2d 876 [19 Cal.Rptr. 106]; and *Haldeman* v. *Haldeman,* 202 Cal.App.2d 498 [21 Cal. Rptr. 75], relied upon by defendant, do not involve a dual divorce decree and are factually dissimilar. In *De Burgh* v. *De Burgh, supra,* 39 Cal.2d 858, 874, it is held that: ''When a divorce is granted to both parties, neither is innocent within

the meaning of this rule, and the community property must be equally divided'';

And on page 873 it is said: ''In many ways the guilt of the parties may be unequal—in the gravity of the misconduct involved, in the frequency of its occurrence, or in its effect upon children and others. . . . Their comparative guilt may have an important bearing upon whether or not either one or both should be granted relief.''

Portion of judgment from which this appeal has been perfected is affirmed.

Shepard, J., and Coughlin, J., concurred.