[Civ. Nos. 23481, 23860. First Dist., Div. One. Mar. 12, 1968.]

LILLIAN MILLINGTON, Plaintiff, Cross-defendant and Respondent, v. GEOFFREY MILLINGTON, Defendant, Cross-complainant and Appellant.

(Consolidated Appeals.)

Joseph F. Di Maria for Defendant, Cross-complainant and Appellant.

Robert J. Dell'Ergo and Carlos O. Tinsley for Plaintiff, Cross-defendant and Respondent.

SIMS, J.—Defendant husband has appealed (1 Civil 23481) from an interlocutory judgment of divorce, awarded to his wife on the grounds of his extreme cruelty, and from all of the orders set forth therein other than that awarding him custody of his minor daughter. He also has purported to appeal from an order denying his motion for a new trial, from an order denying his motion to vacate the judgment, and from an order granting the plaintiff additional attorney's fees, as those orders were entered in the minutes and as they were subsequently incorporated in formal written orders signed and filed in the proceedings. He further purported to appeal from a minute order denying his motion to reopen the trial for additional evidence. In a second appeal (1 Civil 23860) he seeks review of subsequent minute and formal orders granting his wife attorney's fees and costs on appeal. The appeals were consolidated for briefing and hearing.

He states: "In the first Appeal the first objective is to reverse that part of the said judgment providing for payment of any alimony to the respondent; the second objective therein is to obtain a declaration that as a matter of law the property which the trial court found to be community property is in fact the separate property of the appellant. It is not the objective of the appellant in the first appeal to reverse

that part of the Interlocutory Judgment granting a divorce to the respondent.

"In the second Appeal, the objective is to obtain the decision of the Appellate Court that, by virtue of the record, the order for attorneys' fees and costs of transcripts on the first appeal must be reversed."

The order denying the motion for a new trial is not an appealable order and the appeal therefrom must be dismissed. (Code Civ. Proc., § 963.) Insofar as an appeal lies from any of the other orders which are mentioned in the first notice of appeal and which are not embraced in the interlocutory judgment, the appeals are deemed abandoned by failure to press them before this court, and will be dismissed. (See Cal. Rules of Court, rules 13 and 15(a); and 3 Witkin, Cal. Procedure (1954) Appeal, § 150, pp. 2332-2333.) For reasons hereinafter set forth the interlocutory judgment of divorce is reversed with respect to the provision for alimony and affirmed in all other respects, the minute order granting plaintiff attorney's fees and costs on appeal is affirmed, and defendant's appeal from the subsequent formal order is dismissed.

*Background Facts*

The court found the following to be true: That the parties were married on February 22, 1949, and separated on March 4, 1963; that there was one child of the marriage, Tracy L. Millington, who was six years old at the time the complaint was filed; that since the marriage the defendant had treated the plaintiff in an extremely cruel manner; that plaintiff was entitled to an interlocutory decree of divorce on the grounds of the extreme cruelty of defendant; that both parties were fit parents, but that it was in the best interest of the child that custody be granted to the father, with reasonable rights of visitation in the mother; that plaintiff was without sufficient funds for her proper support, maintenance and care and that she was entitled to permanent alimony of $425 per month; that this amount took into consideration plaintiff's present employment and earnings of $275 per month; that the community property of the parties consisted of various enumerated items, divided equally, the parties' home with a net value of $10,000, and the shares of stock in the business known as the Stanford Sport Shop, Inc. with a net worth of $150,000; that plaintiff by reason of the distribution of the home and stock to defendant was entitled to a promissory note in the sum of $85,000 to bear interest at the rate of 6 percent

per annum, with principal and interest payable in monthly installments of not less than $425; that the balance of the principal and interest on the note was to be due and payable, in full, 15 years from the date of the note; that defendant was entitled to various designated items including the home, and the shares of stock in the business, on the condition that he deliver the promissory note to plaintiff; and that defendant was to pay plaintiff's attorney's fees since she did not have the funds to do so.

A summary comment on the evidence presented is in order, in light of the attorney's presentations on appeal. The action below was replete with accusations on both sides. There is sufficient evidence to sustain the granting of the divorce on extreme cruelty based on the wife's testimony of physical and emotional mistreatment, the harsh circumstances under which the husband insisted the family live, and the actions of the husband in response to the wife's illnesses.

Suffice it to say, that there was evidence that the wife had treated her husband with extreme cruelty; that she was a paranoid schizophrenic; and that she had subjected her husband to physical and emotional punishment without cause. Since the trial court determined to believe the wife's testimony, only the evidence relevant to the points raised on appeal will be discussed rather than reviewing the evidence of the parties' discord, as has been done in the parties' briefs.

The remaining pertinent findings and evidence are discussed below.

I. *Determination of and Division of the Community Property*

The court made the following findings that are relevant to its determination that the Stanford Sport Shop was wholly community property, and not wholly or partially the separate property of defendant.

"17. That immediately prior to the marriage of the parties . . . defendant was the owner of a one-half partnership interest in . . . the STANFORD SPORT SHOP, and that the reasonable value of his interest . . . as of that date was . . . $20,500.

"18. That subsequent to said marriage and . . . before the 1st day of January 1954, the . . . co-partnership business . . . was incorporated, with the defendant and his previous partner JOHN CARDOZA . . . as the sole shareholders therein. That thereafter litigation ensued between . . . JOHN CARDOZA and the defendant. . . wherein JOHN CARDOZA sought the dissolution of the corporation and as a result . . . said

litigation was settled and terminated by the purchase by defendant of all interest of . . . JOHN CARDOZA in the . . . corporation . . . representing an approximate one-half. . . . That said . . . interest of JOHN CARDOZA was purchased by the defendant with community funds, assets and credit and- . . . , defendant became sole shareholder of said corporation.

"19. That the success and income of the business . . . as a co-partnership and later as a corporation has been peculiarly and largely dependent upon the personal efforts of the defendant.

"That the plaintiff contributed extensive effort, time and talent in the operation of the business . . . while a partnership and as a corporation.

"20. That the wages paid to plaintiff and the wages paid to defendant by the partnership and by the corporation operating as STANFORD SPORT SHOP did not adequately compensate said parties for their efforts and services; said wages were set and established by the co-partners and later, upon withdrawal from the corporation of . . . JOHN CARDOZA, were set and established from time to time in varying amounts by the defendant . . . ; that the wages and salaries so established by him were determined in accordance with motives and objectives of his not related to a fair return for the efforts of the persons involved.

"21. That for many years after the marriage of plaintiff and defendant, defendant did commingle community and separate assets of the parties in the STANFORD SPORT SHOP with the intention that all should become community property of the parties; that thereafter and for many years prior to the commencement of this action the defendant controlled and established his wages and salary and the wages of the plaintiff from the corporation with a principal motivation of attempting to minimize and defeat any community interest in the said business and to that end he had established salaries and wages less than that to which the parties were fairly entitled.

"22. That the defendant, . . . did leave in the business and did commingle and reinvest therein monies and income . . . attributable to his personal efforts and those of the plaintiff; that the amounts paid by the corporation to the defendant as salary did not adequately compensate the defendant or the community interest for the labor, skill and management of the defendant and plaintiff. As the result of the manipulation by the defendant of his books, records and salaries and accounts, separate property and community property interests of the

parties in the business . . . became so commingled, at first intentionally and later unintentionally, as to make unreasonable any attempt to ascertain the extent of any separate property interest therein.''

The facts upon which these findings are based are as follows: Defendant and one Cardoza started the Stanford Sport Shop, as a partnership in 1945. Each man initially invested either $2,000 or $4,000. The assets of the business were its inventory, cash and the ability of the partners. The store in which the shop was located was rented.

Defendant and plaintiff were married in 1949. At the time of the marriage, defendant deposited some $1,200 into a joint checking account and plaintiff deposited $800 in the same account. It was Mrs. Millington's understanding that the money was to be used to further the parties' business interests. At this time the value of defendant's interest in the business was $20,462. After the marriage, plaintiff began working in the business. She continued to do so until the birth of the child in 1957. At first she worked at home, doing the books of the company. In April 1949, she began to work in the store. She worked three to four days a week. with extra work during the busier periods of the year. At the beginning she was paid $60 a month, and after several months this was raised to $125. The defendant indorsed the plaintiff's checks, and usually deposited the amount to a joint checking account. During the last few months that plaintiff worked the defendant told the plaintiff that he was putting her money back into the business, and she did not see the checks at all.

Defendant's salary in 1948, the year prior to his marriage, was $6,458. The salary was exactly one-half of the net income of the partnership. In 1949 it was $9,151; in 1950, $5,921; in 1951, $10,066; in 1952, $10,383; and in 1953, $11,213. Defendant did not draw the full amount of his salary for living expenses, and the balance of the undrawn amount went back into the business. Plaintiff indicated that during this period the parties lived very frugally.

In 1951, the partnership purchased the store in which the shop was located for $35,000. The terms of the purchase were $10,000 in cash, and the balance by a promissory note secured by a deed of trust on the property.

Mrs. Millington testified that in 1952, when her brother was visiting, defendant ''indicated that our situation, our way of living and so on, would improve, because of the fact that we

were both working and that he considered that I was sharing in his business, in his life.''

As of January 1, 1954, the partners "incorporated," transferred the business, including the real property, to the corporation, and received corporate stock in exchange for the transfer. The total net worth of the enterprise had increased to $72,212.66 by that time.

Within three or four months after incorporation defendant had some ''difficulty'' with Cardoza, which resulted in Cardoza's selling his stock in the business to defendant. (See *Cardoza v. Millington* (1956) 142 Cal.App.2d 26 [297 P.2d 778].) In 1956, after the termination of litigation, defendant agreed to purchase Cardoza's shares for $52,500. The defendant paid Cardoza $18,000 in cash; $13,000 of this amount was secured by a bank loan and $5,000 was from the Millingtons' joint account. However, the joint account was reimbursed within a week from funds withdrawn from defendant's salary account in the corporation. By resolution of the corporation, of which, for all intents and purposes, defendant was the sole shareholder, defendant's salary was increased to $18,000 per year. This sum was to cover the various payments defendant had to make, including his monthly payments to Cardoza, the payments on the bank loan, and the payments for the original purchase of the property. Defendant deemed that his salary was ''within the range of reasonableness all the while . . . [he was] working with the Stanford Sport Shop.''

After the dispute with Cardoza, defendant stated to his wife, ''We will now own the entire business.'' According to Mrs. Millington defendant ''indicated that he was going to eventually own the business and that we would both own it together, was one of the ways that he put it.'' Plaintiff was secretary of the corporation during the period of the court action with Cardoza.

The parties' marriage had deteriorated in the few months after its inception, and defendant began physically abusing his wife after the birth of their child in 1957. Defendant contemplated divorce as early as 1959, and asked his accountant for his analysis of what was the parties' separate property and what was community property. Defendant felt he should protect as much as he could for himself. He indicated that based on his accountant's advice he believed the business was separate property and that if there was a divorce ''whatever was in the corporation . . . [he] could substantiate as . . . [his] separate property.'' Thus, in the years

from 1956 on, despite the resolution authorizing a salary of $18,000, defendant withdrew the following amounts from the corporation, for living expenses as well as the payments of debts: $23,661.02-1957; $16,349.75-1958; $14,775.03-1959; $13,522.37-1960; $6,139.74-1961; and $8,353.19-1962. Mrs. Millington testified that from 1956 on, defendant allowed the family $325 for all of its expenses, including clothes, doctors, payments on the house, expenses for the car and family recreation. Defendant indicated to her the cut-back was necessary because of the Cardoza litigation. By August 1962, the corporation, because of low withdrawal, as against salary, owed the defendant $29,469.[1]

In 1960 or 1961 the state took some 20 feet of the property of the business via eminent domain. Defendant received $33,150 for the property. He had, by this time, repaid the $13,000 borrowed from the bank to pay for Cardoza's shares, and he used the money from the state to pay $22,456 still owed to Cardoza. He used the remaining $10,000 to pay off the first deed of trust on the property. (This first deed of trust was an obligation remaining from the 1951 realty purchased.) There is no indication that defendant was charged for the $33,000, received from the sale, as salary. Moreover, the corporation's obligation to him was not reduced by the condemnation payment.

In 1961 or 1962 a new building was constructed for the business on its property, and was and is being paid for from the earnings of the business.

The success of defendant's business was attributable in part to the growth of the Palo Alto area. However, according to defendant's own testimony, as well as that of an expert witness, success in the sporting goods business is largely attributable to management abilities.

An appraiser hired by plaintiff testified that defendant's business had a net worth of $194,243, and he estimated that the market value of the business was $250,000.[2] The appraiser's figures were based on fiscal 1964-1965, concededly a good snow year. He capitalized a $25,082 estimated annual earnings at the rate of 10 percent to arrive at his total. Another real estate broker and appraiser called by plaintiff estimated

[1]Figures for subsequent years showed that the corporation owed the defendant $27,483 in January 1963, $25,540 in April 1963, $16,618 in November 1964, and $13,017 in January 1965. The dwindling reserve was because of defendant's expenses for this litigation.

[2]The appraiser equated the net value to the net worth figure of $194,243 and added this to the going value (goodwill) increment of $60,196.

the value of the land and improvements alone at $107,500.

Defendant contended that his business had no ''goodwill'' or ''going concern'' value, and he estimated the business' value at $120,000.

Defendant attacks the court's conclusion that the business was community property and each of the findings upon which that result is predicated. He contends that all of the business was his separate property because there was never any commingling of the investment which he owned as his separate property at the time of his marriage and the product of the natural increase of that investment, with the return attributable to his services as represented by salary payments he received over the years; that the community at all times received adequate compensation for his services, and the growth of the business reflects a normal increase in the value of his separate property; and that there is no warrant for any finding, express or implied, that he intended to transmute this separate property into community property. Alternatively, defendant asserts that in any event the court should have determined the ratio between the separate property represented by his investment in the business at the time of marriage and a normal return thereon, and the total net worth of the business at the time of the dissolution of the marriage, so that he could receive credit for the former interest as his separate property. He also filed a request for special findings and four addenda thereto. These requests were not in the form of proposed findings which he sought the court to adopt, but were in the form of interrogatories on evidentiary matters addressed to the court. No warrant is found for such a procedure, and the trial court should be under no duty to answer such interrogatories. (See *South Santa Clara etc. Dist.* v. *Johnson* (1964) 231 Cal.App.2d 388, 404-405 [41 Cal.Rptr. 846].) He did make it clear in these requests, by his objections to the findings proposed by plaintiff, and by his own proposed findings, that he questioned the sufficiency of the evidence to support the finding that the business was community property.

■ ''[W]hen a husband owns a business as his separate property and devotes his efforts to the enterprise, there must be an apportionment of the profits.'' (*Estate of Neilson* (1962) 57 Cal.2d 733, 740 [22 Cal.Rptr. 1, 371 P.2d 745]. See also *Estate of Arstein* (1961) 56 Cal.2d 239, 241 [14 Cal.Rptr. 809, 364 P.2d 33] ; *Gilmore* v. *Gilmore* (1955) 45 Cal.2d 142, 149 [287 P.2d 769] ; *Harrold* v. *Harrold* (1954) 43 Cal.2d 77,

80 [271 P.2d 489]; *Huber* v. *Huber* (1946) 27 Cal.2d 784, 792
[167 P.2d 708]; *Pereira* v. *Pereira* (1909) 156 Cal. 1, 7 [103
P. 488, 134 Am.St.Rep. 107, 23 L.R.A N.S. 880]; *Price* v.
*Price* (1963) 217 Cal.App.2d 1, 6-7 [31 Cal.Rptr. 350];
*Rosenthal* v. *Rosenthal* (1963) 215 Cal.App.2d 140, 145 [30
Cal.Rptr. 49]; *Estate of Ney* (1963) 212 Cal.App.2d 891, 895
[28 Cal.Rptr. 442]; *Haldeman* v. *Haldeman* (1962) 202 Cal.
App.2d 498, 501-502 [21 Cal.Rptr. 75]; *Strohm* v. *Strohm*
(1960) 182 Cal.App.2d 53, 62 [5 Cal.Rptr. 884]; *Mears* v.
*Mears* (1960) 180 Cal.App.2d 484, 506 [4 Cal.Rptr. 618]
[overruled on other grounds *See* v. *See* (1966) 64 Cal.2d 778,
785 [51 Cal.Rptr. 888, 415 P.2d 776]]; *Tassi* v. *Tassi* (1958)
160 Cal.App.2d 680, 690 [325 P.2d 872]; *Mueller* v. *Mueller*
(1956) 144 Cal.App.2d 245, 249 [301 P.2d 90]; *Thomasset* v.
*Thomasset* (1953) 122 Cal.App.2d 116, 124 [264 P.2d 626]
[overruled on other grounds *See* v. *See* (1966) 64 Cal.2d 778,
785 [51 Cal.Rptr. 888, 415 P.2d 776]]; *Randolph* v. *Randolph*
(1953) 118 Cal.App.2d 584, 587 [258 P.2d 547]; *Logan* v.
*Forster* (1952) 114 Cal.App.2d 587, 599 [250 P.2d 730]; *Stice*
v. *Stice* (1947) 81 Cal.App.2d 792, 796 [185 P.2d 402]; *Van
Camp v. Van Camp* (1921) 53 Cal.App. 17, 29 [199 P. 885].)

''Two approaches have ordinarily been made to the alloca-
tion of earnings in such cases: 1. to allow interest on the
capital investment of the business, allocate such interest as
separate property, and treat the balance as community earn-
ings attributable to the efforts of the husband (*Pereira* v.
*Pereira*, 156 Cal. 1 [103 P. 488, 134 Am.St.Rep. 107, 23 L.R.A.
N.S. 880]) [see also *Weinberg* v. *Weinberg* (1967) 67 Cal.2d
557, 564-565 [63 Cal.Rptr. 13, 432 P.2d 709]; *Estate of
Arstein, supra,* 56 Cal.2d 239, 241; *Price* v. *Price, supra,* 217
Cal.App.2d 1, 7; and *Randolph* v. *Randolph, supra,* 118 Cal.
App.2d 584, 587]; 2. To determine the reasonable value of the
husband's services in the business, allocate that amount as
community property, and treat the balance as separate prop-
erty attributable to the normal earnings of the business.
(*Huber* v. *Huber,* 27 Cal.2d 784 [167 P.2d 708]) [see also
*Gilmore* v. *Gilmore, supra.* 45 Cal.2d 142, 149-150; *Harrold* v.
*Harrold, supra,* 43 Cal.2d 77, 80-81; *Estate of Ney, supra,* 212
Cal.App.2d 891, 899; *Strohm* v. *Strohm, supra,* 182 Cal.App.
2d 53, 62; *Mears* v. *Mears, supra,* 180 Cal.App.2d 484. 506-
507; *Thomasset* v. *Thomasset. supra,* 122 Cal.App.2d 116, 124;
*Logan* v. *Forster, supra,* 114 Cal.App.2d 587, 601; and *Van
Camp* v. *Van Camp, supra,* 53 Cal.App. 17, 27-28].'' (*Tassi* v.
*Tassi, supra,* 160 Cal.App.2d 680, 690. See also *Estate of Neil-
son, supra,* 57 Cal.2d 733, 740; *Rosenthal* v. *Rosenthal, supra,*

215 Cal.App.2d 140, 145; and *Haldeman* v. *Haldeman, supra,* 202 Cal.App.2d 498, 505.)

 Defendant insists that the latter formula applies; that the evidence compels findings that the amounts actually withdrawn by him and used in living expenses were an adequate compensation to the community for his personal efforts; and that the balance of the profits over the years whether withdrawn to make payments on the store site, to make payments to his former partner, to make payments on a new building, or left in the business to increase its net worth, were attributable to the natural enhancement of the investment he had in the business at the time of his marriage. If the portion of the business earnings properly allocable as earnings of the husband, which as such is community property, is all consumed in the living expenses of the family, the remaining increment to the business at the time of the dissolution of the community will be considered separate property. (*Estate of Neilson, supra,* 57 Cal.2d 733, 742; *Estate of Arstein, supra,* 56 Cal.2d 239, 241; *Huber* v. *Huber, supra,* 27 Cal.2d 784, 792; *Price* v. *Price, supra,* 217 Cal.App.2d 1, 8-9; *Estate of Ney, supra,* 212 Cal.App.2d 891, 898-899; *Tassi* v. *Tassi, supra,* 160 Cal.App.2d 680, 692; *Thomasset* v. *Thomasett, supra,* 122 Cal. App.2d 116, 126-127; *Logan* v. *Forster, supra,* 114 Cal.App.2d 587, 601-602; and *Van Camp* v. *Van Camp, supra,* 53 Cal. App. 17. 25-26.) Similarly, from the opposite end of the spectrum, if the increase in value of the separate property is solely due to the natural enhancement of the property, the entire property will be considered separate property at its value at the time of the dissolution of the community. (*Estate of Ney, supra,* 212 Cal.App.2d 891, 895; *Strohm* v. *Strohm, supra,* 182 Cal.App.2d 53, 61; and see *Weinberg* v. *Weinberg supra,* 67 Cal.2d 557, 567-568; and *Estate of Neilson, supra,* 57 Cal.2d 733, 740.)

 There is some evidence to support defendant's analysis of the situation. One expert testified that $7,500 would be a reasonable salary for a manager as the business existed in 1964-1965. This testimony did not, however, necessarily mean that there should not be greater compensation to one who had brought the business up to its current volume from its more modest beginnings. There was also testimony to indicate that the increased net worth was caused by the growth of the community. On the other hand, there was adequate testimony from the defendant and another which supports the finding that the growth was due principally to defendant's efforts as

stated above in quoted finding No. 19. For reasons more particularly set forth in connection with the discussion of alimony, the court was not bound to find that the wages, much less the amounts actually drawn by the defendant for his personal use, which were fixed by the defendant himself through his control of the corporation, were the sole measure of the compensation to the community for his efforts.

In *Logan* v. *Forster, supra,* the court observed: ''In making such apportionment between separate and community property our courts have developed no precise criterion or fixed standard, but have endeavored to adopt that yardstick which is most appropriate and equitable in a particular situation . . . , depending on whether the character of the capital investment in the separate property or the personal activity, ability, and capacity of the spouse is the chief contributing factor in the realization of income and profits. [Citation.]'' (114 Cal.App.2d at p. 599.) ''In applying this principle of apportionment the court is not bound either to adopt a predetermined percentage as a fair return on business capital which is separate property nor need it limit the community interest only to the salary fixed as the reward for a spouse's service but may select whatever formula will achieve substantial justice between the parties [citations].'' (*Id.,* p. 600. See also *Haldeman* v. *Haldeman, supra,* 202 Cal. App.2d 498, 505; and *Tassi* v. *Tassi, supra,* 160 Cal.App.2d 680, 691.) On the evidence in this case there is no abuse of discretion in attributing the growth of the business to the personal efforts of the defendant.

Defendant contends that the land, purchased in 1951 and ultimately finally paid for with the proceeds of the condemnation 10 years later, was separate property because it was purchased on the credit of the business, not the credit of the community. (See *Estate of Ellis* (1928) 203 Cal. 414, 417 [264 P. 743]; *Dyment* v. *Nelson* (1913) 166 Cal. 38, 39-40 [134 P. 988]; and *Heney* v. *Pesoli* (1895) 109 Cal. 53, 63 [41 P. 819]; and cf. *Mears* v. *Mears, supra,* 180 Cal.App.2d 484, 505.) This contention overlooks the fact that the property was paid for out of the earnings of the business, attributable to defendant's efforts, either directly, or through the acquisition of the partner's interest. The proceeds of the condemnation would bear the same hallmark as the property itself, and could not lend the property a different character. Similarly the interest in the business which was acquired from the withdrawing partner was either directly or indirectly acquired with profits

which the court properly could, and did, find were the result of defendant's efforts.

There remains for consideration the question of the asserted failure to give the defendant husband any credit for the $20,500 net worth of the business which admittedly was his separate property at the time of marriage. Where, as here, there is a sum definitely attributable to the separate property, it is error not to recognize it, and allocate to it a proper share of the increment in the business. (*Rosenthal* v. *Rosenthal, supra,* 215 Cal.App.2d 140, 145-146; *Strohm* v. *Strohm, supra,* 182 Cal.App.2d 53, 61-62; and cf. *Haldeman* v. *Haldeman, supra,* 202 Cal.App.2d 498, 506; and *Stice* v. *Stice, supra,* 81 Cal.App.2d 792, 797.)

If the investment at the time of marriage subsequently was transmuted from the husband's separate property to community property this former question is rendered moot. (See *Estate of Neilson, supra,* 57 Cal.2d 733, 741-742.) The only findings bearing on this question are as follows: ''21. That for many years after the marriage of plaintiff and defendant, defendant did commingle community and separate assets of the parties in the STANFORD SPORT SHOP with the intention that all should become community property of the parties; . . . 22. That the defendant, as partner and as controlling shareholder in the STANFORD SPORT SHOP, INC., did leave in the business and did commingle and reinvest therein monies and income thereof attributable to his personal efforts and those of the plaintiff; . . . As the result of the manipulation by the defendant of his books, records and salaries and accounts, separate property and community property interests of the parties in the business known as STANFORD SPORT SHOP became so commingled, at first intentionally and later unintentionally, as to make unreasonable any attempt to ascertain the extent of any separate property interest therein.''

Defendant points out that the finding that his interest in the business had a value of $20,500 at the time of marriage is inconsistent with the finding that it is unreasonable to attempt to ascertain the extent of any separate property interest he may have in the business. Since the net worth of the business continually grew it must be concluded that defendant has demonstrated and traced that he had, and unless transmuted has, a separate property interest at least to the extent of $20,500. (See *Weinberg* v. *Weinberg, supra,* 67 Cal.2d 557, 568-570; *Estate of Neilson, supra,* 57 Cal.2d 733, 744; *Pereira* v. *Pereira, supra,* 156 Cal. 1, 6-7; *Title Ins.*

*etc. Co.* v. *Ingersoll* (1908) 153 Cal. 1, 10 [94 P. 94]; *Estate of Cudworth* (1901) 133 Cal. 462, 468 [65 P. 1041]; *Rosenthal* v. *Rosenthal, supra,* 215 Cal.App.2d 140, 144; *Estate of Ney, supra,* 212 Cal.App.2d 891, 895; *Cardew* v. *Cardew* (1961) 192 Cal.App.2d 502, 515 [13 Cal.Rptr. 620]; *Mason* v. *Mason* (1960) 186 Cal.App.2d 209, 212 [8 Cal.Rptr. 784]; *Mears* v. *Mears, supra,* 180 Cal.App.2d 484, 498 and 500; *Tassi* v. *Tassi, supra,* 160 Cal.App.2d 680, 688; and *Thomasset* v. *Thomasset, supra,* 122 Cal.App.2d 116, 124-126.)

There is evidence to support the findings which recite that earnings attributable to the defendant's efforts and wages of the plaintiff were retained in the business, and there is some evidence to show that prior to 1957 the defendant made declarations which indicated that he considered the business as belonging to the parties as community property.

Defendant points out that the findings contain no reference to any executed agreement, express or implied, whereby the parties agreed on the status of the business as separate or community property. He contends that in the absence of such a finding there can be no transmutation of his separate property interest in the business. In *Rosenthal* v. *Rosenthal, supra,* 215 Cal.App.2d 140, the court reversed a finding that securities representing the reinvestment of proceeds of the husband's separate property constituted community property. One finding recited: "'That said community property consists of the commingled, unsegregated and untraced balance of property after allowing defendant credit for the total amount of all of his inheritances and all traced and allocable increases thereof, as hereinabove set forth. . . .'" (215 Cal.App.2d at pp. 146-147.) The court observed, ''Thus it is apparent that the court did not base its finding as to the existence and extent of community property upon any agreement between the parties, but rested its finding and award on the theory that income and profits from the margin account had been commingled with appellant's separate capital and that the whole account had become community property. If the court had found there was an oral agreement between the parties, transmuting separate property into community property, we should be obliged to determine whether there was substantial evidence to support the finding, but there was no such finding, . . .'' (*Id.,* p. 147. See also *Price* v. *Price, supra,* 217 Cal.App.2d 1, 9-10; *Estate of Ney, supra,* 212 Cal.App.2d 891, 900-901; *Calloway* v. *Downie* (1961) 195 Cal.App.2d 348, 352-353 [15 Cal.Rptr. 747]; *Strohm* v. *Strohm, supra,* 182 Cal.

App.2d 53, 61; and cf. *Woods* v. *Security-First Nat. Bank* (1956) 46 Cal.2d 697, 701 [299 P.2d 657]; *Kenney* v. *Kenney* (1934) 220 Cal. 134, 136 [30 P.2d 398]; *Durker* v. *Zimmerman* (1964) 229 Cal.App.2d 203, 205-206 [40 Cal.Rptr. 227]; and *Haseltine* v. *Haseltine* (1962) 203 Cal.App.2d 48, 58-59 [21 Cal.Rptr. 238].) Under the circumstances of this case, where the point has been reserved by objections to findings and proposed counter findings, it cannot be inferred that the trial court found such an executed oral agreement. (Code Civ. Proc., § 634; *Calloway* v. *Downie, supra,* at pp. 351-353.)

In *Title Ins. etc. Co.* v. *Ingersoll, supra,* 153 Cal. 1, it was claimed that the evidence did not support a finding that the wife's separate property, which she had turned over to the husband, had been converted into community property. ■ The court cited the general rule: ''There can be no doubt that a husband and wife may by contract transmute the separate property of either or both into community property. [Citations.]'' (153 Cal. at p. 5.) The court then stated: ''We are of the opinion that the evidence cannot be held legally insufficient to support these findings. It may be conceded that the mere acquirement of the possession of a wife's separate property by the husband, and his subsequent management and control of the same, all with her consent, do not show any intent on the part of the wife to make a gift of the property to the husband, or to change its *status* from separate to community property. The presumption in such a case appears to be that the property continues to be the separate property of the wife, and that the husband takes it in trust for his wife. Under such circumstances it devolves on the husband claiming a gift or change in the *status* of the property to show the same. . . . But it is not essential in such a case for the husband to show any express agreement on the part of the wife. The gift or change in the *status* of the property may be shown by the very nature of the transaction or appear from the surrounding circumstances. [Citations.]'' (*Id.*) After analyzing the evidence the court concluded by referring not to an agreement but to ''the intention of the wife to effect the change in the *status* of the property.'' (*Id.,* p. 6.)

The principle that in the absence of proof of a written or oral agreement a transmutation may be evidenced by the circumstances has been often recognized. (See *Estate of Neilson, supra,* 57 Cal.2d 733, 743; *Dickson* v. *Dickson* (1964) 225 Cal.App.2d 752, 756 [37 Cal.Rptr. 718]; *Estate of Nelson* (1964) 224 Cal.App.2d 138, 143-144 [36 Cal.Rptr. 352];

*Estate of Rogoff* (1962) 205 Cal.App.2d 650, 652-653 [23 Cal. Rptr. 334]; *Lawatch* v. *Lawatch* (1958) 161 Cal.App.2d 780, 789 [327 P.2d 603]; and *Long* v. *Long* (1948) 88 Cal.App.2d 544, 549 [199 P.2d 47].) In *Nelson* (224 Cal.App.2d at p. 144), and *Long* (88 Cal.App.2d at p. 549), as in the *Ingersoll* case, *supra*, the court looked to the unilateral intent of the party who allegedly gave up the separate property interest.

In the instant case there is an express finding that the husband intended that his separate property, and the fruits of his efforts, in the form of community property, were commingled in the business "with the intention that all should become community property of the parties." The evidence supports the finding of commingling and there is testimony of declarations and conduct on his part to support the finding of his intention.

The wife further contends that the ultimate finding that the business was community property is supported by the findings of commingling, which in turn are warranted by the evidence. As noted above, it appears that defendant's investment at the time of marriage can be traced. It is clear, however, that prior to the onset of domestic difficulties there was never any effort to segregate on a realistic basis the fruits of that investment and the fruits of defendant's personal efforts. The profits of the business and the withdrawals of salary by the defendant in the aggregate represented a commingling of those fruits.

In *Mueller* v. *Mueller, supra,* 144 Cal.App.2d 245, the court upheld a finding that a business in which the husband had invested $6,500 nine years prior to his marriage, and had grown through his skill and ability, was community. The court noted, "While it is true that appellant paid $6,500 for the business nine years prior to the marriage, it is also true that the location of the business was changed after the marriage and that new furniture, fixtures and equipment were added. In the absence of any evidence in the record to trace any of the property that was in the business at the time of the marriage, and in view of the manner in which the proceeds of the business were invested and regarded by appellant and respondent, the court may well have concluded that any portion of the present value of the dental laboratory business that could be said to be traceable back to original investment was so intermingled with undisputed community property that it should be regarded as community property. For as stated in 10 California Jurisprudence 2d, pages 702, 703: 'But the presumption in favor of community property applies

to commingled property so that the burden of proof rests upon the party claiming a part as his separate property. Accordingly, if separate property or funds which have been commingled with community property cannot be traced, the entire mass is treated as community property.' " (144 Cal. App.2d at p. 250. See also *Fountain* v. *Maxim* (1930) 210 Cal. 48, 51 [290 P. 576] ; *Estate of Cudworth, supra,* 133 Cal. 462, 468; *Patterson* v. *Patterson,* 242 Cal.App.2d 333, 341 [51 Cal.Rptr. 339] ; *Mason* v. *Mason, supra,* 186 Cal.App.2d 209, 212-213; *Mears* v. *Mears, supra,* 180 Cal.App.2d 484, 499; and *Falk* v. *Falk* (1941) 48 Cal.App.2d 762, 767-769 [120 P.2d 714].)

The foregoing authorities clearly sustained the court's findings insofar as they pronounce that the profits of the business (computed before defendant's withdrawals), subsequent to the marriage may be considered as community property. It is unnecessary to determine whether that commingling of itself, combined with the turnover in inventory and tangible assets of the business,[3] served to effect a transmutation of the defendant's premarital investment. Those factors combined with the original intention of the defendant as manifested by his declarations and other circumstances, are adequate to sustain the particular findings under attack, and the general finding that the business was community property at the time of the dissolution of the marriage. The fact that the evidence might warrant a contrary result is of no consequence. The findings and award of the community property are governed by the following principle: "The finding of a trial court that property is either separate or community in character is binding and conclusive on the appellate court if it is supported by sufficient evidence, or if it is based on conflicting evidence or upon evidence that is subject to different inferences; and if a trial court determines that a presumption has been overcome such determination will not be disturbed on appeal if there is substantial conflict, if different inferences might fairly be drawn from the evidence. [Citations.]" (*Mears* v. *Mears, supra,* 180 Cal.App.2d 484, 500-501.)

---

[3]During the period from marriage to January 31, 1965, the book value of defendant's interest in the business increased from a one-half interest in a partnership, valued at $20,500, to the sole ownership of a corporation with a stated net worth of $158,832.66. The gross sales increased from $105,850 to $361,888, and the inventory from $34,599 to $108,655. During that period real estate was acquired for a store site, and a new store building constructed.

No error is found in the findings and conclusions relating to the extent and disposition of the community property.

II. *Alimony*

The judgment recites: "That plaintiff is without sufficient funds for her proper support, maintenance and care and that plaintiff is hereby awarded permanent alimony and that the amount thereof is the sum of $425.00 per month and that the determination of this amount takes into consideration the fact that plaintiff herself is presently employed and earning approximately $275.00 per month net after taxes and government deductions. That defendant make said alimony payments monthly in advance commencing on July 1, 1965, and on the 1st day of each and every month thereafter." This award is predicated upon findings of fact of similar tenor.

Defendant objected to the award in his objections to proposed findings on the ground that the evidence indicated that plaintiff was employed and had sufficient funds for her proper support, maintenance and care, and on the further ground that the findings did not contain any indication of the earnings and income of defendant. In his abortive requests for special findings defendant did seek to determine what expenses and income of the respective parties were considered by the court in making the award of alimony. In his proposed findings, which may properly be considered a request for findings, he requested findings that the wife was earning $325 per month gross, that said sum was adequate for her needs, and that the defendant's average earnings did not exceed $750 per month.

In his motion for a new trial he renewed his objections on the foregoing grounds, and further asserted that the award of alimony was improper in view of the other property received by the wife under the terms of the interlocutory decree. These grounds are all presently asserted.

In addition, defendant contends that his alleged cruelty is not such as to justify the award on a punitive basis. There is nothing in the record to indicate that the court predicated its award on any such ground. Plaintiff engages in an elaboration of the evidence of defendant's cruelty which is unnecessary to the issue of alimony, but does not attempt to uphold the award on that ground. "Where a divorce is granted to both parties, . . . In determining whether or not to grant alimony, the court should consider *the comparative guilt of the parties,* the needs of one spouse, and the ability of the other spouse to contribute support. (*Mueller* v. *Mueller*

(1955) 44 Cal.2d 527, 530 et seq. [232 P.2d 869].)'' (*Nunes* v. *Nunes* (1964) 62 Cal.2d 33, 38 [41 Cal.Rptr. 5, 396 P.2d 37], italics added; and see *DeSanto* v. *DeSanto* (1958) 162 Cal. App.2d 126, 128 [328 P.2d 463].) There is no warrant, however, for measuring the amount of alimony to an innocent spouse by the degree of cruelty. In *Cardew* v. *Cardew, supra,* 192 Cal.App.2d 502, this court held that further evidence of cruelty ''would not have been relevant to the issue of how much alimony appellant [wife] should receive, . . .'' (192 Cal.App.2d at p. 508; and see *Lamborn* v. *Lamborn* (1926) 80 Cal.App. 494, 500 [251 P. 943].) The comparison of the fault of the parties, when each is granted a divorce, fulfills its function when the court determines to award or deny alimony (*id.*). Language in *DeSanto, supra,* and other cases ''indicating that the court may or should consider comparative fault in fixing the amount or duration of alimony'' was expressly rejected as expressing an improper principle (*id.,* p. 510).

The distribution of the community property may be governed by the following rule: ''[T]he greater the offense the larger the proportion of the community property that must be awarded to the innocent spouse; . . .'' (*Arnold* v. *Arnold* (1946) 76 Cal.App.2d 877, 881 [174 P.2d'674].) The provision for a suitable allowance for the wife's support contemplated by section 139 of the Civil Code is predicated, however, upon the theory ''that the husband entered upon an obligation which bound him to support his wife during the period of their joint lives, that by his own wrong he has forced her to sever the relation which enabled her to compel the performance of this duty, and that he is required to make compensation for the offense committed by him which has deprived her of the benefit of the obligation. [Citations.]'' (*Id.,* at pp. 885-886. *Accord: Webber* v. *Webber* (1948) 33 Cal.2d 153, 157-158 [199 P.2d 934]; *Stuckey* v. *Stuckey* (1964) 231 Cal.App.2d 382, 385 [41 Cal.Rptr. 792]; and *Brawman* v. *Brawman* (1962) 199 Cal.App.2d 876, 880 [19 Cal.Rptr. 106].)

The granting or refusing of alimony, and the amount thereof, if allowed, is largely in the discretion of the trial court, and its action will not be disturbed in the absence of an abuse of discretion. (*Nunes* v. *Nunes, supra,* 62 Cal.2d 33, 38; *Hall* v. *Hall* (1954) 42 Cal.2d 435, 442 [267 P.2d 249]; *Webber* v. *Webber, supra,* 33 Cal.2d 153, 161; *Stuckey* v. *Stuckey, supra,* 231 Cal.App.2d 382, 386; *Dickson* v. *Dickson, supra,*

918

225 Cal.App.2d 752, 755; *Rosenthal* v. *Rosenthal, supra,* 215 Cal.App.2d 140, 147-148; *Blankenship* v. *Blankenship* (1963) 212 Cal.App.2d 736, 743 [28 Cal.Rptr. 176]; *Cronk* v. *Cronk* (1962) 210 Cal.App.2d 683, 691 [27 Cal.Rptr. 229]; *Schulze* v. *Schulze* (1962) 206 Cal.App.2d 330, 335-336 [23 Cal.Rptr. 693]; *Brawman* v. *Brawman, supra,* 199 Cal.App.2d 876, 879; *Cardew* v. *Cardew, supra,* 192 Cal.App.2d 502, 509; *Strohm* v. *Strohm, supra,* 182 Cal.App.2d 53, 56; *Vogel* v. *Vogel* (1960) 182 Cal.App.2d 628, 629 [6 Cal.Rptr. 402]; *DeSanto* v. *DeSanto, supra,* 162 Cal.App.2d 126, 128; *Mueller* v. *Mueller, supra,* 144 Cal.App.2d 245, 253; *Newbauer* v. *Newbauer* (1949) 95 Cal.App.2d 36, 39 [212 P.2d 240]; *Lamborn* v. *Lamborn, supra,* 80 Cal.App. 494, 499.)

 The bounds of this discretion have been defined as follows: "The only specification of the Civil Code for an award of alimony is that it shall be a 'suitable allowance' 'having regard for the circumstances of the respective parties. . . .' (Civ. Code, § 139.) This is frequently expressed as the weighing of the 'wife's needs' against the 'husband's ability to pay' (3 Witkin, Summary of Cal. Law (1960) pp. 2659-2660). In *Hall* v. *Hall* (1954) 42 Cal.2d 435 [267 P.2d 249], our Supreme Court (per Edmonds, J.) said (on page 442): ' "Circumstances" includes "practically everything which has a legitimate bearing upon the present and prospective matters relating to the lives of both parties." (*Lamborn* v. *Lamborn,* 80 Cal.App. 494, 499 [251 P. 943].) " [I]t refers to the needs of the parties and the abilities of the parties to meet such needs; and in measuring such circumstances, consideration should be given to property owned and obligations to be met as well as to ability to earn and actual earnings." (*Becker* v. *Becker,* 64 Cal.App.2d 239, 242 [148 P.2d 381].)'" (*Stuckey* v. *Stuckey, supra,* 231 Cal.App.2d 382, 385, and see cases last cited, *passim.*)

 In reviewing the ability of the husband, his contention that the salary paid him by the corporation, in whose name his business is conducted, determines his ability to pay, must be rejected. He cannot by a unilateral act, through his control over the corporate structure, regulate the flow from the spigot from which the wife's thirst must be quenched. (See *Strohm* v. *Strohm, supra,* 182 Cal.App.2d 53, 59-61.) By the same token, the wife cannot insist that a salary, fixed at a figure unwarranted by the earning power of the business in order to make payments to the former partner, is determinative of defendant's ability to pay. Where the husband controls the business, the true measure is its ability to furnish

him with the wherewithal to sustain and enjoy life, whether it be by salary, dividends, or benefits in kind, such as meals, lodging and automobile expense. (See *Dickson* v. *Dickson, supra,* 225 Cal.App.2d 752, 755.) The proprietor's election to retain earnings in the business, to insure its growth or to reduce its indebtedness, must be scrutinized to prevent jeopardizing the rights of those who have just claims on his income.

With these reservations in mind, an examination of the evidence reflects that the maximum ability of defendant to pay would be predicated upon an appraiser's testimony, in May 1965, that the net income of the business for the fiscal year ending March 21, 1965, as computed on projected figures for the months of February and March 1965, would be $25,082, after corporate taxes.[4] In arriving at this sum the appraiser allowed $7,500 salary for the performance of the services rendered by defendant, rather than the $9,000 which had been fixed by corporate action. Presumably a total sum of $32,582 (net income plus salary) would be available to defendant before payment of personal income taxes. An examination of the corporate figures on which both parties rely casts considerable suspicion on the foregoing estimate. A review of the sum of the net profit of the corporation plus the amount of salary allowed to defendant and deducted from the corporation's gross earnings for each of the six fiscal years ending with March 31, 1964, and for the first ten months of the fiscal year preceding the trial in 1965, reveals a maximum figure before personal income taxes of approximately $23,000.[5] The average for the five best, of the six full years, is about $20,500, and if account is taken of the lean years 1962-1963 the average is slightly less than $17,500. It is difficult to

---

[4] (According to defendant's account the corporate taxes, if properly computed would lower this figure to $19,544.)

[5]

| Year | Net Profit | Salary | Total |
|------|-----------|--------|-------|
| 1959 | $ 1,295.01 | $ 18,000.00 | $ 19,295.01 |
| 1960 | 4,048.32 | 18,000.00 | 22,048.32 |
| 1961 | 5,112.72 | 18,000.00 | 23,112.72 |
| 1962 | 385.50 | 18,000.00 | 18,385.50 |
| 1963 | [8,454.66] | 10,603.19 | 2,148.53 |
| 1964 | 7,224.60 | 9,000.00 | 16,224.60 |
| 1965 (10 mos.) | 6,542.16 | 7,500.00 | ⎰14,042.16 |
| Projected (2 mos.) | | | ⎱ 2,808.43 |
| 1965 (total) | | | $ 16,850.59 |

reconcile a 1964-1965 reported ten months aggregate of $14,042.16, which if projected for two additional months would produce only $16,850.59, with the appraiser's estimate of approximately $32,500. With this projection for 1965, the average annual available funds over the seven years is approximately $17,300. Similar figures result from analysis of the growth in net worth plus salaries paid. These figures are cited, not for the purpose of reweighing the evidence, but in order to show the importance to defendant of a specific finding concerning the extent of his ability to pay.

Attempts to determine the just claims against the husband, which must be considered in determining his net income available for the payment of alimony, are hampered by obfuscation and pyramiding of obligations. At the trial in May 1965, he testified to monthly obligations of $1,053. In argument he asserts that this sum is necessary for his basic living expenses and recurring special expenses for his daughter. Analysis reveals that of that sum $250 was for temporary alimony. $50 was for the liquidation of a state hospital bill for the wife (the interlocutory judgment August 20, 1965 recites a balance due of $1,522 and orders defendant to pay it), and $323 was for clothing, schooling, psychiatric and other medical care for the daughter, and $530 was applicable to the personal expenses of defendant including the meals furnished his daughter. He further testified that he had community obligations, acknowledgedly payable by him, in the sum of $549; and that he owed his attorney for legal services rendered in the case. The list of obligations suggests, but does not explain, a possible duplication with the monthly expense for the schooling and psychiatric care for the daughter, the utility bills and house payments.

The record clearly reflects that by the judgment the defendant was ordered to pay outstanding bills, including some of the wife's expenses of litigation and the state hospital bill, in the total sum of $4,347.75. Following the decision and prior to judgment, he was ordered to pay $3,500 for the wife's attorney's fees, and by the interlocutory decree he was ordered to pay an additional $2,400. In addition, plaintiff was allowed $250 in connection with arguments on defendant's motion for new trial and related motions. According to defendant's testimony at the hearing in March 1966, he borrowed $5,000 from the bank to pay the former sum, and other expenses, and still owed $2,100 which he was paying off to the bank at the rate of $223.87 monthly. He testified that he had been paying off the $2,650 in fees at the rate of $500 per month. A small

balance remained on this sum. His own attorney had been paid a total of $11,869, and his further obligations to the attorney were being paid off at the rate of $500 per month. He paid approximately $1,600 for transcripts in connection with his appeal. Defendant also points out that in addition to repaying $10,000 (see below) to the corporation, he must make some provision to pay his wife $85,000 before the expiration of 15 years.

In order to finance payments and some of his recurrent expenses defendant increased his salary to $2,000 per month gross in July 1965 and borrowed $10,000 from the corporation in February 1966. According to his testimony the $2,000 gross produced a net, after withholding taxes, of $1,608 per month. It does not appear whether the deduction used in computing the withholding tax was commensurate with the deduction the defendant would have for his alimony and interest payments, and the medical expenses for the care of his daughter.

Of a total figure of $2,700 defendant allegedly was paying out in March 1966, $1,000 represented payments to the attorneys, of which sum, one more payment of $500 or less would discharge the obligation to his wife's attorney; $223.87 represented payments on the $2,100 balance of a bank loan; and $850 represented the alimony and interest payments to his wife. The balance of approximately $625 was considerably less than the approximately $850 he previously testified was necessary for the support of himself and his daughter. Apparently the obligations referred to in the interlocutory decree had been liquidated by that time.

Defendant argues that the needs of the wife should be determined by the standard of living he maintained for her during the marriage. The record reflects that in 1956, and for many years thereafter, the family lived on $325 per month, and that sums taken by the husband from the business for his own use, after payments on account of indebtedness incurred to purchase the business, were not lavish. It is not important to determine whether the penurious state in which the family lived was justified by the savings which went into the business, or whether they were the result of an unwarranted frugality on the part of the husband. Suffice it to say in neither event should he enjoy the fruits of those years of joint self-denial without sharing with her in part. The wife should be able to show her reasonable needs commensurate with her station in life as it existed at the time of the separation and divorce, and not at the lower standard of living which may

have been either self-imposed or forced upon her in earlier years.

According to the wife's testimony, her monthly needs for support totaled $625. (She further indicated that if she was granted custody of the daughter she would need an additional $70 for rent and $295 for general expenses—a total consistent with defendant's request of approximately $325 for the daughter.) In this sum she included $210 for food and entertaining, $20 for entertainment and gifts, and $30 for recreation and vacation. Her testimony at the subsequent hearing[6] indicated that in the seven or eight months since the interlocutory decree she had incurred dental and medical expenses of from $450 to $500 as against an estimated $35 per month; that she had spent an average of $200 per month on clothes during the eight months, as contrasted with an estimate of $18 per month; and that she was attempting to save for a new car because of the expense of operating her old one. The wife seeks to justify needs in excess of the $625 on the grounds that the list is incomplete in that the amount allocated for shoes and clothing was inadequate, and there was "no allowance for auto replacement, income taxes, or some other items." She urges that she is not in good health and that the interest payment she receives on the note for her share of the community property "is necessary for something more than minimum requirements, and to protect against unforeseen future expenses."

The husband's charge that there is no warrant for finding needs in excess of the sum of $625 is buttressed by the wife's testimony at the supplementary hearing. It was there revealed that prior to the entry of the interlocutory decree in August 1965 she had been living on her then gross salary of $325 per month, plus $250 paid by her husband, and ended up with a small commercial account balance. The defendant also brought out that during the seven or eight-month period following the entry of the interlocutory decree, the wife had received $5,950 or $6,800 in monthly payments from him and a net salary of $279.15 per month after a $25 per month raise. During this period she paid $15 per month into an employee's credit union, accumulated approximately $2,400 in bank accounts,

---

[6]The testimony at the hearing for attorney's fees and costs on appeal cannot be considered in determining the propriety of the award made on the basis of the evidence adduced at the earlier trial. Nevertheless, it has been alluded to by the parties, and is set forth here to give the full detail which was before the court in connection with the order which is the subject of the second appeal.

and deposited $1,500 or $2,000 with her attorney to be applied against future legal services in connection with matters other than the divorce. A comparison of the amount received, $6,800, with the minimum saved and on hand in bank accounts ($2,000), and with the attorney ($1,500), leaves a balance of $3,300 expended, or less than $500 per month for her support.

The wife's means with which to meet her needs are undisputed. Her gross earnings and the payments received from her husband total $1,200. Insofar as her net income after payment of federal and state income taxes exceeds $625, she is enjoying income in excess of her needs which can only be warranted if her ex-husband's income is such as to justify the increase in her standard of living over that basic sum.

The husband under the most optimistic appraisal could secure $2,700 per month from the business. After the payment of interest and alimony to the wife he would be left with $1,850 per month on which to pay income taxes. From the fact that he was subjected to deductions of $392 on a monthly salary of $2,000, it may be fair to infer that roughly 20 percent, or at least $350, would be payable monthly in income and social security taxes. From the $1,500 remaining, approximately $300 would be applicable to the support of the daughter. The husband's remaining $1,200 per month, after taxes, with personal needs of $530 per month, compares favorably with the wife's $1,200 per month gross, and personal needs of $625. Under such circumstances it might not be inequitable to have him liquidate out of his surplus income the fixed obligations which have been enumerated above.

This equity is more apparent than real. If the husband's annual income is found to be consistent with the past average earnings of his business, from approximately $17,000 to $20,500, he is left with a gross monthly income of from approximately $1,400 to $1,700. If the latter figure is used, the defendant, after the payment of alimony, interest, and the support of his daughter, is left with $550 a month, *less* taxes, with which to meet personal needs of $530 per month and the liquidation of the enumerated debts. If the lower figure is used the discrepancy is more glaring.

In view of the requests for special findings and the conflicting evidence concerning the income available to the defendant, it cannot be inferred that the court would have found the defendant's income to be commensurate with the larger figure. (Code Civ. Proc., § 634; *Culberton* v. *Cizek*

(1964) 225 Cal.App.2d 451, 464-466 [37 Cal.Rptr. 548]; *29 Palms Van & Storage* v. *Los Angeles Metropolitan Transit Authority* (1963) 221 Cal.App.2d 183, 185-186 [34 Cal. Rptr. 430]; *Garber* v. *City of Los Angeles, supra,* 226 Cal.App. 2d 349, 354-356 [38 Cal.Rptr. 157].) The question of the husband's ability to pay was a material issue of ultimate fact, not a mere evidentiary matter. (Cf. *South Santa Clara etc. Dist.* v. *Johnson, supra,* 231 Cal.App.2d 388, 404-405.) Nor did the evidence require that any finding on the subject would be adverse to the defendant. (Cf. *Coronet Credit Corp.* v. *West Thrift Co.* (1966) 244 Cal.App.2d 631, 647-648 [53 Cal. Rptr. 433].)

The finding of the court upon which the judgment rests may be deemed to establish that the wife has needs commensurate with the sum of her $275 monthly net income and the $425 the defendant was ordered to pay as alimony, or a total of $700. Of this sum, all in excess of $625 can only be justified on the record if the defendant has income in excess of the sum of his needs and the basic amount necessary to meet those of the wife. The findings are silent with respect to the husband's ability to pay. The merit of an express finding on the husband's specific ability to pay alimony cannot be overstressed. Not only does it avoid some of the controversy which marks this case, but also it is of inestimable value in future proceedings where one party or the other is seeking a modification of alimony because of a change of circumstances. The defendant, when he has so requested, is entitled to an express finding on this issue and the case must be reversed for that purpose.

 The failure to mention in the alimony finding that $425 is to be paid to the wife monthly as interest on the note given for her share of the community property, as contrasted with the express mention of her wages, suggests that the trial court did not consider this payment in assessing the wife's ability to meet her needs. This suggestion is given more credence by remarks of the court which indicated that it disregarded her income from this source.[7] If it did so, it was error.

---

[7] In arguing this motion for new trial, the defendant pointed out the discrepancy between the $1,200 monthly gross income the wife would receive, and her needs as evidenced by her testimony in the sum of approximately $620. The court observed, "Well, the interest, of course, part of the division of property. I mean that's because she is not having handed over to her right then and there her share of the community property." Defendant pointed out the difference between requiring the wife to use the income from property received and requiring her to use

In *Stuckey* v. *Stuckey, supra,* 231 Cal.App.2d 382, the court noted that the wife had received by agreement one-half of the securities owned by the couple, of a value of $39,000 to $42,000. It observed, "This is an important factor in decision. Although the appeal is not upon the ground of an inadequate distribution of the property, the wife's financial position is vital in determining whether the alimony award of $200 is adequate." (231 Cal.App.2d at pp. 384-385.) The court considered the prospective income from these securities in determining that the alimony plus other income was adequate at law, if not a generous provision, for her needs (*id.,* pp. 386-387).

In *Cronk* v. *Cronk, supra,* 210 Cal.App.2d 683, the trial court, as in this case, made provision for the wife to buy out half of the husband's interest in a business by giving a secured note. The court upheld the award of money, $125,000, in lieu of the specific interest in community property. (210 Cal.App.2d at p. 689; and see *Weinberg* v. *Weinberg, supra,* 67 Cal.2d 557, 566; *Dallman* v. *Dallman* (1958) 164 Cal. App.2d 815, 819 [331 P.2d 245].) The wife also objected that the alimony award was inadequate. The court stated: "It certainly cannot be said as a matter of law that the court abused its discretion in making the alimony award for the support and maintenance of plaintiff in view of the amount of property she was awarded and the income that she will have from the sale of her share of the . . . stock." (*Id.,* at p. 691; and see *Dallman* v. *Dallman* (1959) 170 Cal.App.2d 729, 737-739 [339 P.2d 636]; and *DeSanto* v. *DeSanto, supra,* 162 Cal.App. 2d 126, 129.)

Whether the alimony award should be upheld as not excessive (see *Dickson* v. *Dickson, supra,* 225 Cal.App.2d 752, 755; *Rosenthal* v. *Rosenthal, supra,* 215 Cal.App.2d 140, 147-148; *Blankenship* v. *Blankenship, supra,* 212 Cal.App.2d 736, 743-744; *Strohm* v. *Strohm, supra,* 182 Cal.App.2d 53, 57-61; and *Mueller* v. *Mueller, supra,* 144 Cal.App.2d 245, 253), or reversed as excessive (see *Hall* v. *Hall, supra,* 42 Cal.2d 435, 442; and *Dallman* v. *Dallman, supra,* 170 Cal.App.2d 729, 737-

---

her capital. The court then queried rhetorically: "In other words, in a case where there is a lot of money, if the wife receives some stocks and bonds and actually there was enough dividends and interest to pay her living expenses, she would get no alimony?" Subsequently, the court interjected, "If you are going to consider her interest in the business, represented by this note and deed of trust, then as far as income, don't you have to consider what he has, which is the business and the profits above that?"

739) must depend, under the circumstances of this case, upon a factual finding as to the ability of the defendant to provide for his former spouse. The case must be reversed for that purpose.

III. *Attorney's Fees and Costs on Appeal*

Defendant's secondary appeals (No. 1 Civ. 23860) are from the minute order and from the formal order which granted the plaintiff $1,000 for attorney's fees, and the costs of copies of the clerk's and reporter's transcripts, all as necessitated by defendant's appeal. Since the minute order did not expressly direct that a written order be prepared, it was the proper subject of appeal (Cal. Rules of Court, rule 2(b)(2)), and the appeal from the written order will be stricken as redundant. (*Teichner* v. *Klassman* (1966) 240 Cal.App.2d 514, 525 [49 Cal.Rptr. 742].)

The facts concerning the relative economic positions of the parties have been reviewed in connection with the discussion of the award of alimony. The defendant established that the plaintiff had accumulated funds, including those on deposit with her attorney, which would enable her to pay her own attorney's fees and costs. It also was clearly brought out that he was hard pressed to pay his recurring expenses for the support and maintenance of himself and his daughter, along with the nonrecurring obligations he owed. "It was within the discretion of the trial court to award [the wife] such costs and attorneys' fees as may be reasonably necessary to enable her to resist the . . . appeal [by the husband]. (Civ. Code, § 137.3; . . .)" (*Blankenship* v. *Blankenship, supra,* 212 Cal.App.2d 736, 749-750.) Although it might not have been an abuse of discretion to deny the wife attorney's fees and costs in view of her resources (*Price* v. *Price, supra,* 217 Cal.App.2d 1, 10), it is no abuse of discretion to grant the wife such relief merely because she is in a better position than the husband to pay her attorney. (*Clevenger* v. *Clevenger* ·(1961) 189 Cal.App.2d 658, 676 [11 Cal.Rptr. 707, 90 A.L.R.2d 569]; and see *Goto* v. *Goto* (1960) 187 Cal.App.2d 594, 598 [5 Cal.Rptr. 753].) In *Weinberg* v. *Weinberg, supra,* 67 Cal.2d 557, the court rejected the contention that the wife's attorney's fees should have been charged against the community property before it was distributed. The court observed, "Section 137.3 of the Civil Code . . . gives the court discretion to order payment of 'such amount as may be reasonably necessary . . . for attorney's fees' without regard to the available sources. Even when the wife has separate property in addition

to community property, the trial court need not require her to resort to her own capital for payment of her counsel before ordering her husband to pay attorney's fees. [Citations.]'' (67 Cal.2d at p. 571.)

In the absence of a clear abuse of discretion, the amount fixed by the trial court will not be disturbed. (*Dickson* v. *Dickson, supra,* 225 Cal.App.2d 752, 758.)

That portion of the interlocutory judgment awarding alimony is reversed. The other portions of the judgment are affirmed. The minute order granting attorney's fees and costs on appeal is affirmed. The appeals and purported appeals from other orders of the court are dismissed. The trial court is directed to amend its findings of fact and conclusions of law in accordance with the views expressed herein, to redetermine the amount of alimony and to enter the appropriate judgment.

Molinari, P. J., and Elkington, J., concurred.

The petitions for a rehearing were denied April 1, 1968, and the petitions of appellant in both cases and of respondent in Civ. 23481 for a hearing by the Supreme Court were denied May 9, 1968. Sullivan, J., did not participate therein.